# United States Court of Appeals
# for the Federal Circuit

---

**ALLEN ENGINEERING CONTRACTOR INC.,**

*Plaintiff-Appellant,*

v.

**UNITED STATES,**

*Defendant-Appellee.*

---

2014-5094, -5095, -5096

---

Appeal from the United States Court of Federal Claims in Nos. 1:13-cv-00684-JFM, 1:13-cv-00695-JFM, and 1:13-cv-00720-JFM, Senior Judge James F. Merow

---

**BRIEF OF PLAINTIFF-APPELLANT ALLEN ENGINEERING CONTRACTOR, INC.**

---

William L. Bruckner
Bruckner Law Firm
4550 Kearny Villa Road, Suite 209
San Diego, CA 92123
Telephone: (858) 565-8300
Counsel for Appellant

Chelsey N. Del Testa
Bruckner Law Firm
4550 Kearny Villa Road, Suite 209
San Diego, CA 92123
Telephone: (858) 565-8300
Of Counsel

**August 11, 2014**

---

# CERTIFICATE OF INTEREST

As required by Federal Rule of Appellate Procedure 26.1 and Federal Circuit Rule 47.4, counsel for Plaintiff-Appellant Allen Engineering Contractor Inc., certifies the following:

1. The full name of every party represented by me is:
   > Allen Engineering Contractor, Inc.

2. The name of the real party in interest represented by me is:
   > Allen Engineering Contractor, Inc.

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by me are:
   > There is no such corporation of company

4. The names of all law firms and the partners and associates that have appeared for the party represented by me in the trial court or are expected to appear in this court are:

   > William L. Bruckner
   > Bruckner Law Firm
   > 4550 Kearny Villa Road, Suite 209
   > San Diego, CA 92123

DATED:  August 11, 2014          By: /s/ William L. Bruckner
                                    William L. Bruckner

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST …………………………………………………i

TABLE OF CONTENTS …………………………………………..………...ii

TABLE OF AUTHORITIES ……………………………………..…………. v

TABLE OF ABBREVIATIONS ……………………………….…..…….viii

STATEMENT OF RELATED CASES …………………….…………….....1

JURISDICTIONAL STATEMENT …………………………………….... 1

STATEMENT OF THE ISSUES ……………………………………….. 2

STATEMENT OF THE CASE ………………………..……………………. 3

STATEMENT OF FACTS ……………………………………..….. 4

      CONTRACT ONE-RANGE 409 …………………………..…….. 4

      CONTRACT TWO-P559 ……………………………….. 11

      CONTRACT THREE-P105 ……………………………….... 18

SUMMARY OF ARGUMENT ………………………………………. 26

STANDARD OF REVIEW …………………………………………... 27

      Federal Legal Standard for a Motion to Dismiss ……………....... 28

ARGUMENT …………………………………………………. 29

  I.    AECI'S TERMINATION FOR DEFAULT WAS IMPROPER
       UNDER 48 C.F.R §52.249-10(a), FAR 52-228-15, AND FAR
       §52.228.2 …………………………………….… 29

A.    Where There is No Issue With Work Performance The Navy Cannot Terminate A Contract for Default Under 48 C.F.R. §52.249-10(a) ………………………………… 30

B.    Where There Is No Issue With Performance and Payment Bonds at the Outset of Performance The Navy Cannot Terminate A Contract for Default Under FAR Clause 52-228-15 ……………..……………………………… 32

C.    Where the Navy found the Replacement Bonds Acceptable, The Navy Cannot Terminate a Contract for Default Under FAR §52.228.2 ………………………..… 34

D.    The Circumstances of AECI's Termination for Default Do Not Fit Within the Bright Line Test of *Airport Industrial v. US.* ……………………….……………… 35

E.    AECI'S Termination for Default was Improper Under 48 C.F.R. 52-249-10(b) …………………………………… 36

II.    THE NAVY HAD SUPERIOR KNOWLEDGE THAT ERIC CAMPBELL WAS SUBMITTING FRAUDULENT PIC BONDS ……………………………………………………… 39

III.    THE NAVY OWED A DUTY TO AECI TO ADEQUATELY INVESTIGATE THE REPLACEMENT BONDS ………………... 40

IV.    THE NAVY MATERIALLY BREACHED THE CONTRACT BY NEGLIGENTLY INVESTIGATING THE PIC REPLACEMENT BONDS AND RELEASING THE LIBERTY BONDS …………... 42

V.    THE NAVY'S ACTION ARE IN BREACH OF THE IMPLIED OBLIGATION OF GOOD FAITH AND FAIR DEALING ……… 45

VI.    CONCLUSION ………………………………………………… 46

ADDENDUM …………………………………………………………… 50

CERTIFICATE OF SERVICE ……………………………………………….

CERTIFICATE OF COMPLIANCE …………………………………………

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys., Inc.,*
    988 F.2d 1157, 1164 (Fed.Cir.1993) …………………………………….... 29

*Airport Industrial Park, Inc. v. United States,*
    59 Fed. Cl. 332, 334(2004) ……………………………… 26, 29, 35, 36, 46

*Alaska Airlines, Inc. v. Johnson,*
    8 F.3d 791, 795 (Fed.Cir.1993) …………………………………………... 47

*Am. Airlines, Inc. v. United States,*
    551 F.3d 1294, 1300 (Fed.Cir.2008) …………………………………….... 31

*Ashcroft v. Iqbal,*
    556 U.S. 662, 678 (2009) ……………………………………………… 28

*Atkins North America, Inc. v. U.S.,*
    106 Fed.Cl. 491, 506 (2012) …………………………………………….47

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544, 555 (2007) ……………………………………………… 28

*Blue Cross & Blue Shield United of WI & Subsidiaries v. United States,*
    71 Fed. Cl. 641, 660 (Fed. Cl. 2006)…………………………………… 39

*Brandt v. Hickel,*
    427 F.2d 53, 57 (9th Cir.1970) …………………………………………... 48

*Cedars–Sinai Med. Ctr. v. Watkins,*
    11 F.3d 1573, 1584 n. 13 (Fed.Cir.1993) ………………………………… 29

*Centex Corp. v. United States,*
    395 F.3d 1283, 1304 (Fed.Cir.2005) …………………………………….... 45

*First Nationwide Bank v. United States,*
    431 F.3d 1342, 1350 (Fed.Cir.2005) ……………………..………………… 45

*Forest Indus. Inc. v. United States,*
    973 F.2d 1548, 1551 (Fed.Cir.1992) …………………………………….... 43

*Gisler v. United States,*
    232 F.3d 864, 869 (Fed.Cir.2000) ……………………………….......... 39

*Hansen Bancorp, Inc. v. United States,*
    367 F.3d 1297, 1312 (Fed.Cir.2004) …..…………………………………… 43

*Hearts Bluff Game Ranch, Inc. v. United States,*
    69 F.3d 1326, 1328 (Fed. Cir. 2012) ……………………………………… 27

v

*J.A. Jones Const. Co. v. U.S.*,
    390 F.2d 886, 888 (Ct.Cl.1968) ……………………………………….. 39

*John Reiner & Co. v. United States*,
    163 Ct.Cl. 381, 325 F.2d 438, 440 (Ct.Cl.1963)………………………….. 48

*Malone v. United States*,
    849 F.2d 1441, 1445 modified, 857 F.2d 787 (Fed. Cir. 1988) ………….. 43

*Maxima Corp. v. United States*,
    847 F.2d 1549, 1556 (Fed.Cir.1988)………………………………………... 48

*Metcalf Const. Co., Inc. v. United States*,
    742 F.3d 984, 990 (Fed. Cir. 2014)…………………………………… 45

*Millenium Lumber Distrib., Ltd., v. United States*,
    558 F.3d 1326, 1328 (Fed. Cir. 2009)……………………………………… 31

*Schism v. United States*,
    316 F.3d 1259, 1302 (Fed.Cir.2002)………………………………………... 47

*Sommers Oil Co. v. United States*,
    241 F.3d 1375, 1378 (Fed. Cir. 2001) …...………… 28, 29, 39, 40, 42, 45, 48

*Thomas v. Dep't of Hous. and Urban Dev.*,
    124 F.3d 1439, 1442 (Fed.Cir.1997)………………..……………………… 42

**STATUTES**

28 U.S.C. § 1295(a)(3) …...………………………………………………… 2

28 U.S.C. § 1491 (a) (1) …………………………………………………….. 1

40 U.S.C. § 3131 …………………………...………………… 5, 7, 12, 13, 14, 19, 21

41 U.S.C. §§ 7103 …………….…………………………………………… 1

41 U.S.C. §§ 7104 …………….…………………………………………… 1

**FEDERAL REGULATIONS**

48 C.F.R. § 28.102-1(a) ………….……………………………. 7, 13, 14, 20, 21

48 C.F.R. §28.106-2 …………………………………………….. 7, 14, 20, 22

48 C.F.R. § 28.228-15 …………………………...………………………. 5, 12, 19

48 C.F.R. §52.249-10(a) ……………………………………… 2, 26, 29, 30, 46, 47

48 C.F.R. §52-249-10(b) …………………………………………….... 2, 26, 29, 36

FAR § 52-228-15 …………………………………………….. 2, 26, 29 32, 33

FAR § 52.228.2 ……………………………………………….…… 2, 26, 34, 35

## RULES

RCFC 8(a)(2) ……………………………………………………………… 28

Fed.R.Civ.P. 8(a)(2) ………………………………………………….. 28

## OTHER AUTHORITIES

*Corbin on Contracts* § 1104 (1964) ………………………….………………. 42

Restatement (Second) of Contracts § 205 (1981) ………………………………… 45

Restatement (Second) of Contracts § 241(e) (1981) …………………………… 43

# TABLE OF ABBREVIATIONS

| | |
|---|---|
| AECI | Allen Engineering Contractor Inc. |
| Range 409 | The Contract entered into between AECI and the NAVY on or about July 26, 2012, on the terms of which AECI agreed to provide all labor, materials and equipment to construct the Repair of Range 409 at Marine Corps Base, Camp Pendleton, California under contract N62473-09-D-1644, Delivery Order No. 0003 in the amount of $2,855,419.00 |
| P559 | The Contract entered into between AECI and the NAVY on or about June 29, 2012, on the terms of which AECI agreed to provide all labor, materials and equipment to construct the P-559 E-2D Training Facility at Point Mugu, Naval Base Ventura County under contract N62473-09-D-1654, Delivery Order No. 0004 in the amount of $11,553,083.00 |
| P105 | The Contract entered into between AECI and the NAVY on or about June 15, 2012, on the terms of which AECI agreed to design and thereafter provide all labor, materials and equipment to construct the P-105 Tracked Vehicle Maintenance Cover at 1st Tank Battalion at Marine Corps Air Ground Combat Center (MCAGCC) Twentynine Palms, CA. under contract N62473-09-D-1654, Delivery Order No. 0005 in the amount of $12,301,127.05 |
| A___ | Joint Appendix page(s) |
| court | United States Court of Federal Claims, the honorable Judge James F. Merow presiding |
| Court | United States Court of Appeals for the Federal Circuit |
| PIC | Pacific Indemnity Company |

| ISG | Individual Surety Group, LLC |
| Liberty | Liberty Mutual Insurance Co. |
| NAVFAC | Navy procedural regulations |
| POC | Person of Contact |
| FAR | Federal Acquisition Regulation |
| NTP | Notice to Proceed |
| CO | Contracting Officer |

## STATEMENT OF RELATED CASES

On May 22, 2014, Plaintiff-Appellant filed three appeals with the United States Court of Federal Claims. Plaintiff-Appellant appealed from the United States Court of Federal Claims case numbers 1:13-cv-00684-JFM, 1:13-cv-00695-JFM, and 1:13-cv-00720-JFM. The appeals were docketed in the Court of Appeals for the Federal Circuit as case numbers 14-5094, 14-5095, and 14-5096. The issues on appeal are identical in each case. On July 2, 2014, this Court consolidated the appeals with the master docket number of 14-5094.

Counsel knows of no other case pending in this Court or in any other court that may directly affect, or be directly affected by, the Court's decision in this Appeal.

## JURISDICTIONAL STATEMENT

The three cases at issue involve claims under the Contracts Disputes Act. The United States Court of Federal Claims has jurisdiction under 28 U.S.C. § 1491 (a) (1), 41 U.S.C. §§ 7103 and 41 U.S.C. §§ 7104.

The Court of Federal Claims issued its order on case number 1:13-CV-684 on March 27, 2014, granting Defendant's Motion to Dismiss. The Court of Federal Claims issued its order on case number 1:13-CV-695 and 1:13-CV-720 on May 8, 2014, granting Defendant's Motion to Dismiss. This appeal is from the three orders above in which the court granted Defendant's motion to dismiss.

Final Judgment was entered: 1) on March 28, 2014 for case number 1:13-CV-684, 2) on May 9, 2014 for case number 1:13-CV-695, and 3) on May 9, 2014 for case number 1:13-CV-720. Because the Court of Federal Claims entered final judgment, this Court has exclusive jurisdiction over this appeal based on 28 U.S.C. § 1295(a)(3).

## STATEMENT OF THE ISSUES

Did the United States Court of Federal Claims err in finding that Plaintiff's termination for default was proper on the basis that Plaintiff failed to state a claim for relief on the following grounds:

1.   the Navy improperly terminated AECI for default under 48 C.F.R. §52.249-10(a);

2.   the Navy improperly terminated AECI for default under FAR Clause 52-228-15;

3.   the Navy improperly terminated AECI for default under FAR §52.228.2;

4.   the Bright Line Test of *Airport Industrial v. US,* does not apply to the Facts between AECI and the Navy;

5.   the Navy improperly terminated AECI for Default under 48 C.F.R. 52-249-10(b).

2

6.  the Navy had Superior Knowledge that Eric Campbell was Submitting Fraudulent PIC Bonds

7.  the Navy owed a duty to AECI to investigate the replacement bonds

8.  the Navy materially breached the contract by negligently investigating the replacement bonds and releasing the Liberty bonds; and

9.  the Navy breached the implied obligation of good faith and fair dealing.

## STATEMENT OF THE CASE

In September 2013, AECI sued the Navy in the United States Court of Federal Claims under the Contracts Dispute Act for a reversal of AECI's termination for default on three construction projects (Range 409, P559, and P105). AECI's claims and the Navy's basis for terminating AECI for default was the same for all three contracts.

On September 16, 2013, AECI sued the Navy in the United States Court of Federal Claims for a reversal of AECI's Termination for Default on the Camp Pendleton Contract. ("RANGE 409"). On March 27, 2014, the Court of Federal Claims granted the United States' Motion to Dismiss under Rule 12(b)(6) and on March 28, 2014, AECI's Complaint was dismissed. On May 22, 2014, AECI appealed the Court of Federal Claims ruling on the United States' Motion to Dismiss.

3

On September 18, 2013, AECI sued the Navy in the United States Court of Federal Claims for a reversal of AECI's Termination for Default on the Point Mugu Naval Base contract. ("P559"). On May 8, 2014, the Court of Federal Claims granted the United States' Motion to Dismiss under Rule 12(b)(6) and on May 9, 2014, AECI's complaint was dismissed. On May 22, 2014, AECI appealed the Court of Federal Claims ruling on the United States' Motion to Dismiss.

On September 24, 2013, AECI sued the Navy in the United States Court of Federal Claims for a reversal of AECI's Termination for Default on the Marine Corps Air Ground Combat Center Twentynine Palms, CA contract. ("P105"). On May 8, 2014, the Court of Federal Claims granted the United States' Motion to Dismiss under Rule 12(b)(6) and on May 9, 2014, AECI's complaint was dismissed. On May 22, 2014, AECI appealed the Court of Federal Claims ruling on the United States' Motion to Dismiss.

## STATEMENT OF FACTS

### CONTRACT ONE-RANGE 409

On or about July 26, 2012, AECI entered into a competitively bid contract with the Navy on the terms of which AECI agreed to provide all labor, materials and equipment to construct the Repair of Range 409 at Marine Corps Base, Camp Pendleton, California, contract number N62473-09-D-1644, Delivery Order No. 0003.

4

AECI was awarded the contract on or about July 26, 2012 in the sum of two million, eight hundred fifty five thousand and four hundred nineteen dollars ($2,855,419.00). The project was to provide design, engineering and construction of primary and supporting facilities for the project. The contract required the project to be completed by July 22, 2013.

As required by 40 U.S.C. § 3131 and 48 C.F.R. § 28.228-15, on or about August 12, 2012, AECI provided Liberty Mutual Insurance Co. Miller Act payment and performance bonds to the Navy. After a period of investigation, rejection, resubmission, investigation, rejection, resubmission and finally acceptance, the Navy, by letter dated September 6, 2012, accepted the Liberty Bonds. (A35-39).

The Navy clearly understood that the Navy had the sole obligation and the authority to authenticate AECI's Miller Act payment and performance bonds. (A35-39).

On February 13, 2013, AECI forwarded replacement Miller Act payment and performance bonds from the Pacific Indemnity Company to the Navy for authentication and approval and, if approved, AECI requested that the Navy substitute the PIC bonds for the Liberty bonds. The proposed replacement PIC bonds were acquired from Individual Surety Group, LLC, a company which was represented by ISG and other federal contractors to be a bid, payment and

performance bond broker for PIC, a subsidiary of the Chubb Group. The Navy reviewed and rejected the PIC bonds on February 26, 2013. (A40-44).

Approximately thirty-one (31) days after first receiving the PIC bonds, on or about March 1, 2013, the Navy allegedly commenced an investigation into the authenticity of the PIC Bonds, as the Navy and every other agency of the United States, is required to conduct in accordance with the US Code, the Federal Acquisition Regulation and, in this case, Navy procedural regulations (NAVFAC P-68). The Navy's investigation commenced with the Navy telephoning "Ed Campbell" directly to receive a verbal confirmation of the authenticity of the PIC bonds. The Navy's investigation continued with a letter allegedly sent to PIC requesting written confirmation of the PIC bonds. (A45).

On or about March 14, 2013, thirty-one (31) calendar days after AECI had submitted the PIC bonds to the Navy for approval, the Navy requested "Ed Campbell" forward the bond authenticity request to PIC instead of directly contacting PIC or provide a phone number for the POC. Apparently, although the Navy had PIC's correct address it chose not to send out a verification letter, requesting that "Ed Campbell" procure the "written confirmation by …" PIC. Further, the PIC bonds clearly indicate the address for PIC. (A45).

Although approximately 70 days later the PIC bonds were alleged by PIC to be fraudulent or invalid payment and performance bonds, the PIC bonds appear,

6

even to this date, to be perfect 40 U.S.C. § 3131, 48 C.F.R. § 52.228-15, and 48 C.F.R. § 28.102-1(a) Miller Act payment and performance bonds—even including the raised PIC corporate seal in the correct location on the PIC bonds.  (A40-44; A45; A46-47).

The Navy's actions in not forwarding the request for authentication directly to PIC was in direct conflict with paragraph 28.102-1 of the NAVFAC P-68 Contracting Manual (A125-242) which very clearly prohibits the Navy from contacting the surety's agent for Miller Act payment and performance bond authentication and requires that the Navy send a copy of the payment performance bonds directly to the surety. (A114-124).  AECI alleges that the Navy did not send the required letter requesting authentication of the PIC bonds directly to PIC and, as such, failed to comply with 48 C.F.R. §28.106-2 and ¶28.102-1 of the NAVFAC P-68 Contracting Manual regarding authentication of Miller Act payment and performance bonds—as such the Navy was negligent and breached its contractual obligations to AECI. (A114-124).

What is therefore a material fact that cannot be disputed, is that the Navy clearly understood that the Navy had the sole responsibility for investigating, authenticating, approving and accepting replacement Miller Act payment and performance bonds. The undisputed fact being further that the Navy did not

assume this responsibility gratuitously but had THE responsibility by statute and regulation. (A40-44; A4; A46-47; A114-124).

From the contents of the March 6, 2013 emails, it appears that the Navy did not call the telephone number listed within Treasury Circular 570 (A57-58) to conduct a verbal PIC bond verification with PIC. AECI believes that the Navy did not call PIC's phone number listed in Treasury Circular 570 and failed to send the verification request to the PIC address. AECI believes that the Navy, as such, failed to comply with Navy regulations (NAVFAC P-68) and the FAR regarding verifying the authenticity of the PIC Bonds—as such the Navy was negligent and breached its contractual obligations to AECI. (A40-44; A45; A46-47; A114-124).

The Navy, by email of April 10, 2013, after what appears to be a fifty-six (56) day (February 14 to April 10, 2013) investigation into the validity of the PIC bonds, determined the PIC bonds were valid thereby substituting the PIC bonds for the Liberty bonds. The Navy's letter of April 10, 2013 expressly states, "The surety, Pacific Indemnity Company, has authenticated your performance and payment bonds and you may commence work." (A48).

Further, ¶ 28.106-2 NAVFAC P-68 requires that the individual that approves the substitution must be Level III contracting officer. (A35-39, A125-141).

28.106-2 Substitution of surety bonds.

> A Level III contracting officer approval is required prior to substituting the original bond with a new surety bond covering all or part of the obligations on the previously approved bond.

In information and belief it is alleged that Leilani J. Murray is not a Level III contracting officer, and as such, had no authority to return the Liberty bonds or to approve a substitution of the PIC Bonds for the Liberty bonds. (A48, A125-141).

The Liberty bonds were returned to Liberty on or about April 23, 2013. Liberty, by UPS overnight delivery, notified the Navy and PIC that PIC bonds had been substituted for Liberty bonds. The Navy should have received the Liberty notification on or about May 3, 2013. Liberty's letter allowed the Navy seven (7) days to object to the substitution. (A49-55).

In response, on or about May 6, 2013, Walter Maxwell of PIC telephonically advised AECI and the Navy that the PIC bonds were not actually issued by PIC and were not "valid" bonds. (A49-55). Further, on or about May 7, 2013, PIC advised the Navy by electronic mail that the PIC bonds were not issued by PIC and were not "valid" bond/instruments. (A49-55).

Liberty had allowed the Navy seven (7) days after receipt of its substitution letter to notify Liberty of any issues with the substitution. The Navy was fully aware that the PIC bonds were not "valid" bonds approximately three (3) days after the date of the Liberty letter. The Navy took no action to insist upon the return of the Liberty bonds—yet the Navy had the "last clear chance" to rescind its approval

9

and acceptance of the PIC bonds on or before the seven day period has expired on May 10, 2013. (A49-55; A56).

On May 8, 2013, the Navy, by way of letter, informed AECI that the PIC bonds were fraudulent and requested that AECI provide replacement performance and payment bonds. (A56). Inexplicably the Navy took no action and has not to this date taken any action against either PIC or Liberty. On May 20, 2013, the Navy suspended the contract performance pending receipt of valid performance and payment bonds. (A57-58).

On or about June 10, 2013, AECI responded to the Navy's suspension, advising the Navy of its negligent investigation and proposing multiple solutions that would allow the construction of RANGE 409 to move forward and satisfy FAR requirements. Note that AECI demanded that the Navy contact Liberty, rescind the Navy's substitution of the PIC bonds for the Liberty bonds, and demand that Liberty return the Liberty bonds. The Navy took no action. (A59-68).

At about the same date, on June 11, 2013, the Navy issued AECI a Cure Notice requesting replacement bonds within ten (10) days of receipt of the Cure Notice. (A69). The Navy rejected AECI's June 10, 2013 proposals on or about June 17, 2013. (A70).

On June 24, 2013, the Navy issued a Show Cause Letter. (A71-72). On July 3, 2013, AECI responded to the Navy's Show Cause letter and again proposed multiple solutions that would allow the construction of RANGE 409 to move forward and satisfy FAR requirements. (A73-79).

On July 10, 2013, the Navy issued a Notice of Termination for Default. (A80-82).

On July 30, 2013, PIC filed a Complaint against Eric Campbell, ISG and Steve Stokeling. (A83-113).

A close review of the PIC Complaint against Eric Campbell, et al, reveals that the November, 2012 bond fraud was actually on a NAVFAC Navy project at the Naval Air Station, Pensacola, Florida that was awarded on September 28, 2012. Thus, the Navy and PIC was or should have been aware that Eric Campbell, et al, was submitting fraudulent PIC bonds as early as October, 2012. (See ¶¶ 30-45 pages 7-10 of A83-113). The bonds attached at Exhibit A of the PIC complaint against Eric Campbell are exact copies of the PIC bonds attached to *Plaintiff's Complaint.* (A40-44).

## CONTRACT TWO-P559

On or about June 29, 2012, AECI entered into a contract with the Navy on the terms of which AECI agreed to provide all labor, materials and equipment to

construct the P-559 E-2D Training Facility at Point Mugu, Naval Base Ventura County under contract number N62473-09-D-1654, Delivery Order No. 0004.

AECI was awarded the contract on July 29, 2012 in the sum of eleven million, five hundred fifty-three thousand, and eighty three dollars ($11,553,083.00). The project consisted of new construction of an operational training facility that will hold an operational flight trainer simulator, a weapons system trainer, and a combat information center simulator for the E-2D Advanced Hawkeye Aircraft. The contract called the PROJECT to be completed by October 7, 2013.

As required by 40 U.S.C. § 3131 and 48 C.F.R. § 28.228-15, on or about July 13, 2012, AECI provided Liberty Mutual Insurance Co. Miller Act payment and performance bonds to the Navy. The Navy, by letter dated July 17, 2012, accepted the Liberty bonds. (A142). It appears that the Navy did not issue a formal NTP. Regardless, in response to an oral notice to proceed, on or about September 17, 2012, AECI commenced construction on P-559.

On March 4, 2013, AECI submitted replacement payment and performance bonds from the Pacific Indemnity Company to the Navy for approval and, if approved, AECI requested that the Navy substitute the PIC bonds for the Liberty bonds. The proposed replacement PIC bonds were acquired from Individual Surety Group, LLC, a company which was represented by ISG and other federal

12

contractors to be a bid, payment and performance bond broker for Pacific Indemnity Company, a subsidiary of the Chubb Group. Although approximately 63 days later the PIC bonds were alleged by PIC to be fraudulent payment and performance bonds, the PIC bonds appear, even to this date, to be perfect 40 U.S.C. § 3131, 48 C.F.R. § 52.228-15, AND 48 C.F.R. § 28.102-1(a) Miller Act payment and performance bonds—even including the raised PIC corporate seal in the correct location on the PIC bonds. (A146-150).

The cavalier attitude of the Navy toward its statutory and regulatory responsibilities is evidenced by the Navy's message of March 4, 2013. (A196).

On or about March 27, 2013, 23 calendar days after AECI had submitted the PIC bonds to the Navy for approval, the Navy had not yet accepted the PIC bonds and AECI requested the Navy Contracting Officer review the PIC bonds. (A143-145; A196).

Approximately 30 days after receipt of the PIC bonds, on or about April 2, 2013, the Navy allegedly commenced an investigation into the acceptability of the PIC Bonds, as the Navy and every other agency of the United States, is required to conduct in accordance with the US Code, the Federal Acquisition Regulation and, in this case, Navy procedural regulations (NAVFAC P-68). (A143-145).

Allegedly the Navy verbally confirmed the authenticity of the PIC bonds on April 2, 2013 by calling an "Ed Campbell of Pacific Indemnity Company". By

email dated April 3, 2013, the Navy requested written confirmation of the PIC Bonds by allegedly sending an email requesting confirmation of authenticity directly to Ed Campbell, without sending any letter to Pacific Indemnity's Treasury Circular 570 address. Eric Campbell responded directly to the Navy's Contracting Officer on April 3, 2013. (A143-145).

Although approximately 70 days later the PIC bonds were alleged by PIC to be fraudulent or invalid payment and performance bonds, the PIC bonds appear, even to this date, to be perfect 40 U.S.C. § 3131, 48 C.F.R. § 52.228-15, and 48 C.F.R. § 28.102-1(a) Miller Act payment and performance bonds—even including the raised PIC corporate seal in the correct location on the PIC bonds. (A143-145; A146-150; A151-155; A156-161).

The NAVY's actions in not forwarding the request for authentication directly to PIC was in direct conflict with ¶ 28.102-1 of the NAVFAC P-68 Contracting Manual which very clearly prohibits the NAVY from contacting the surety's agent for Miller Act payment and performance bond authentication. (A125-141).

AECI alleges that the Navy did not send the required letter requesting authentication of the PIC bonds directly to PIC and, as such, failed to comply with 48 C.F.R. §28.106-2 and ¶28.102-1 of the NAVFAC P-68 Contracting Manual regarding authentication of Miller Act payment and performance bonds—as such

the NAVY was negligent and breached its contractual obligations to AECI. (A125-141; A143-145; A146-150; A151-155; A156-161; A162; A179-195; A196).

What is therefore a material fact that cannot be disputed, is that the Navy clearly understood that the Navy had **THE** sole responsibility for investigating, authenticating, approving and accepting replacement Miller Act payment and performance bonds. The undisputed fact being further that the Navy did not assume this responsibility gratuitously but had THE responsibility by statute and regulation. (A46-47; A125-141; A143-145; A151-155).

The Navy, by letter of April 4, 2013, after what appears to be a 30 day (March 4 to April 3, 2013) investigation into the validity of the PIC bonds, determined the PIC bonds were valid and returned the Liberty bonds to AECI thereby substituting the PIC bonds for the Liberty bonds. The Navy's letter of April 4, 2013 expressly states, "Your payment and performance bonds for the subject contract have been reviewed and approved." The Navy Contracting Officer also agreed to mail the original Liberty bonds to AECI. (A151-155).

Further, ¶ 28.106-2 NAVFAC P-68 requires that the individual that approves the substitution must be Level III contracting officer. (A125-141).

In information and belief it is alleged that Leilani J. Murray is not a Level III contracting officer, and as such, had no authority to return the Liberty bonds or to approve a substitution of the PIC bonds for the Liberty bonds. (A151-155).

The Liberty bonds were returned to Liberty on or about April 23, 2013. Liberty, by UPS overnight delivery, by letter dated May 2, 2013 notified the Navy and PIC that PIC bonds had been substituted for Liberty bonds. The Navy should have received the Liberty notification on or about May 3, 2013. Liberty's letter allowed the Navy seven (7) days to object to the substitution. (A156-161).

In response, on or about May 6, 2013, Walter Maxwell of PIC telephonically advised AECI and the Navy that the PIC bonds were not actually issued by PIC and were not "valid" bonds. Further, on or about May 7, 2013, PIC advised the Navy by electronic mail that the PIC bonds were not issued by PIC and were not "valid" bond/instruments. (A156-161).

Liberty had allowed the Navy seven (7) days after receipt of its substitution letter to notify Liberty of any issues with the substitution. The Navy was fully aware that the PIC bonds were not "valid" bonds approximately three (3) days after the date of the Liberty letter. The Navy took no action to insist upon the return of the Liberty bonds—yet the Navy had the "last clear chance" to rescind its approval and acceptance of the PIC bonds on or before the seven day period has expired on May 10, 2013. (A156-161; A162).

On May 9, 2013, the Navy, by way of letter, informed AECI that the PIC bonds were fraudulent and requested that AECI provide replacement performance and payment bonds. (A162). Inexplicably the Navy took no action and has not to

this date taken any action against either PIC or Liberty. On May 20, 2013, the Navy suspended the contract performance pending receipt of valid performance and payment bonds. (A163-164).

On or about June 10, 2013, AECI responded to the Navy's suspension, advising the Navy of its negligent investigation and proposing multiple solutions that would allow the construction of P559 to move forward and satisfy FAR requirements. Note that AECI demanded that the Navy contact Liberty, rescind the Navy's substitution of the PIC bonds for the Liberty bonds, and demand that Liberty return the Liberty bonds. The Navy took no action. (A59-68).

At about the same date, on June 11, 2013, the Navy issued AECI a Cure Notice requesting replacement bonds within ten (10) days of receipt of the Cure Notice. (A165). The Navy rejected AECI's June 10, 2013 proposals on or about June 17, 2013. (A166).

On June 20, 2013, the Navy issued a Show Cause Letter. (A167-168) July 1, 2013, AECI responded to the Navy's Show Cause letter and again proposed multiple solutions that would allow the construction of P559 to move forward and satisfy FAR requirements. (A169-175).

On July 5, 2013, the date the Navy issued a Notice of Termination for Default. (A176-178).

On July 30, 2013, PIC filed a Complaint against Eric Campbell, ISG and Steve Stokeling. (A83-113).

A close review of PIC Complaint against Eric Campbell, et al, reveals that the November, 2012 bond fraud was actually on a NAVFAC Navy project at the Naval Air Station, Pensacola, Florida that was awarded on September 28, 2012. *See ¶¶ 30-45 pages 7-10 of* (A83-113). Thus the Navy and PIC was aware that Eric Campbell, et al, was submitting fraudulent PIC bonds as early as November, 2012. (A83-113).

### CONTRACT THREE-P105

On or about June 15, 2012, AECI entered into a design/build contract with the Navy on the terms of which AECI agreed to design and thereafter provide all labor, materials and equipment to construct the P-105 Tracked Vehicle Maintenance Cover at 1st Tank Battalion at Marine Corps Air Ground Combat Center (MCAGCC) Twentynine Palms, CA. N62473-09-D-1654, Delivery Order No. 0005.

AECI was awarded the Contract on June 15, 2012 in the sum of twelve million, three hundred one thousand, and one hundred twenty seven dollars and five cents ($12,301,127.05). The project was to provide design, engineering and construction of primary and supporting facilities for the project. The contract required the project to be completed by March 22, 2014.

As required by 40 U.S.C. § 3131 and 48 C.F.R. § 28.228-15, on or about June 29, 2012 (delivered July 2, 2012), AECI provided Liberty Mutual Insurance Co. Miller Act payment and performance bonds to the Navy. After a period of investigation by the Navy, the Navy, by letter dated January 3, 2013[1], accepted the Liberty bonds. (A197-199).

AECI actually commenced design on or about July 9, 2012. The 100% design had been approved by the Navy and the final design was ready to be submitted for approval when the contract was terminated. As of the date of the termination the Navy had not yet authorized construction to proceed.

On February 26, 2013, AECI forwarded replacement payment and performance bonds from the Pacific Indemnity Company to the Navy for investigation, authentication, review, approval and, if approved, AECI requested that the Navy substitute the PIC bonds for the Liberty bonds. The proposed replacement PIC bonds were acquired from Individual Surety Group, LLC, a company which was represented by ISG and other federal contractors to be a bid, payment and performance bond broker for Pacific Indemnity Company, a subsidiary of the Chubb Group. Although approximately 70 days later the PIC bonds were alleged by PIC to be fraudulent or invalid payment and performance bonds, the PIC bonds appear, even to this date, to be perfect 40 U.S.C. § 3131, 48

---

[1] AECI never received a copy of the LIBERTY authentication letter and has no knowledge of whether such a letter exists.

C.F.R. § 52.228-15, and 48 C.F.R. § 28.102-1(a) Miller Act payment and performance bonds—even including the raised PIC corporate seal in the correct location on the PIC bonds. The PIC bonds were received by the Navy on February 27, 2013. (A200-206).

After filing the Complaint in this case an additional document was found in AECI's files. According to the Navy email dated February 26, 2013[2], the CO returned the Liberty Mutual Bonds prior to conducting any investigation into the validity of the PIC bonds. (A237). The return of the Liberty bonds without an investigation into the validity of the PIC bonds was in violation of numerous regulations and statutes, including 48 C.F.R. §28.106-2 and ¶28.102-1 of the NAVFAC P-68 Contracting Manual. AECI received the Liberty bonds from the Navy on or about March 4, 2013 and thereafter returned the Liberty bonds to Liberty.

Approximately seven (7) days after receipt of the PIC bonds and after returning the Liberty bonds, on or about March 5, 2013, the Navy allegedly commenced an investigation into the acceptability of the PIC bonds, as the Navy and every other agency of the United States, is required to conduct in accordance with the US Code, the Federal Acquisition Regulation and, in this case, Navy procedural regulations (NAVFAC P-68). The Navy's investigation commenced

---

[2] The Navy Memorandum is probably misdated because according to the FEDEX receipt the PIC bonds were not received by Charlene Ray until February 27, 2014.

with the Navy requesting that AECI provide the Navy with an email address or phone number for PIC "POC". (A207-212).

On or about March 6, 2013, eight (8) calendar days after AECI had submitted the PIC bonds to the Navy for approval, the Navy requested AECI forward the bond authenticity request to PIC instead of directly contacting PIC or provide a phone number for the POC. Apparently although the Navy had PIC's correct address it chose not to send out a verification letter, requesting that AECI send the "request for Bond Authenticity" to PIC. The Navy also requested a phone number for the "POC"—Treasury Circular 570 provides a phone number and an address for PIC for the Navy to use to verify payment and performance bonds. (A46-47) Further, the PIC bonds clearly indicate the address for PIC. AECI unequivocally and repeatedly advised the Navy that Eric Campbell was an "...agent at Individual Surety Group LLC." (A207-212).

Although approximately 70 days later the PIC bonds were alleged by PIC to be fraudulent or invalid payment and performance bonds, the PIC bonds appear, even to this date, to be perfect 40 U.S.C. § 3131, 48 C.F.R. § 52.228-15, and 48 C.F.R. § 28.102-1(a) Miller Act payment and performance bonds—even including the raised PIC corporate seal in the correct location on the PIC bonds. (A200-206; 207-212; A213; A214-216).

The Navy's actions in not forwarding the request for authentication directly to PIC was in direct conflict with ¶ 28.102-1 of the NAVFAC P-68 Contracting Manual which very clearly prohibits the Navy from contacting the surety's agent for Miller Act payment and performance bond authentication. *(A237).*

AECI alleges that the Navy did not send the required letter requesting authentication of the PIC bonds directly to PIC and, as such, failed to comply with 48 C.F.R. §28.106-2 and ¶28.102-1 of the NAVFAC P-68 Contracting Manual regarding authentication of Miller Act payment and performance bonds—as such the Navy was negligent and breached its contractual obligations to AECI. (A125-141; A200-06; A207-12; A213; A214-16).

What is therefore a material fact that cannot be disputed, is that the Navy clearly understood that the Navy had **THE** sole responsibility for investigating, authenticating, approving and accepting replacement Miller Act payment and performance bonds. The undisputed fact being further that the Navy did not assume this responsibility gratuitously but had THE responsibility by statute and regulation. (A125-141; A200-06; A207-12; A213; A214-16).

The Navy, by email of April 3, 2013, after what appears to be a thirty-five (35) day (February 26 to April 2, 2013) investigation into the validity of the PIC bonds, determined the PIC bonds were valid thereby substituting the PIC bonds for the Liberty bonds. The Navy's letter of April 3, 2013 expressly states, "This email

is to notify you that your payment and performance bonds for contract N62473-09-D-1654-0005, P105 TRACKED VEHICLE MAINTENANCE FACILITY, MARINE CORPS AIR GROUND COMBAT CENTER, TWENTYNINE PALMS, CA Rework, have been approved." (A213).

Further, ¶ 28.106-2 NAVFAC P-68 requires that the individual that approves the substitution must be Level III contracting officer. (A237).

In information and belief it is alleged that Leilani J. Murray is not a Level III contracting officer, and as such, had no authority to return the Liberty bonds or to approve a substitution of the PIC BONDS for the Liberty bonds. (A213).

The Liberty bonds were returned to Liberty on or about April 23, 2013. Liberty, by UPS overnight delivery, notified the Navy and PIC that PIC bonds had been substituted for Liberty bonds. The Navy should have received the Liberty notification on or about May 3, 2013. Liberty's letter allowed the Navy seven (7) days to object to the substitution. (A214-16).

In response, on or about May 6, 2013, Walter Maxwell of PIC telephonically advised AECI and the Navy that the PIC bonds were not actually issued by PIC and were not "valid" bonds. Further, on or about May 7, 2013, PIC advised the Navy by electronic mail that the PIC bonds were not issued by PIC and were not "valid" bond/instruments. (A214-16).

Liberty had allowed the Navy seven (7) days after receipt of its substitution letter to notify Liberty of any issues with the substitution. The Navy was fully aware that the PIC bonds were not "valid" bonds approximately three (3) days after the date of the Liberty letter. The Navy took no action to insist upon the return of the Liberty bonds—yet the Navy had the "last clear chance" to rescind its approval and acceptance of the PIC bonds on or before the seven day period has expired on May 10, 2013. (A214-16; A217).

On May 8, 2013, the Navy, by way of letter, informed AECI that the PIC bonds were fraudulent and requested that AECI provide replacement performance and payment bonds. (A217). Inexplicably the Navy took no action and has not to this date taken any action against either PIC or Liberty Mutual. On May 20, 2013, the Navy suspended the contract performance pending receipt of valid performance and payment bonds. (A218-19).

On or about June 10, 2013, AECI responded to the Navy's suspension, advising the Navy of its negligent investigation and proposing multiple solutions that would allow the design of P105 to move forward and satisfy FAR requirements. Note that AECI demanded that the Navy contact Liberty, rescind the Navy's substitution of the PIC bonds for the Liberty bonds, and demand that Liberty return the Liberty bonds. The Navy took no action. (A59-68).

At about the same date, on June 11, 2013, the Navy issued AECI a Cure Notice requesting replacement bonds within ten (10) days of receipt of the Cure Notice. (A220-21). The Navy rejected AECI's June 10, 2013 proposals on or about June 17, 2013. (A222).

On June 20, 2013, the Navy issued a Show Cause Letter. (A223-25). On July 3, 2013, AECI responded to the Navy's Show Cause letter and again proposed multiple solutions that would allow the design of P105 to move forward and satisfy FAR requirements. (A226-233).

On July 10, 2013, the Navy issued a Notice of Termination for Default. (A234-36).

On July 30, 2013, PIC filed a Complaint against Eric Campbell, ISG and Steve Stokeling. (A83-113).

A close review of PIC Complaint against Eric Campbell, et al, reveals that the November, 2012 bond fraud was actually on a NAVFAC Navy project at the Naval Air Station, Pensacola, Florida that was awarded on September 28, 2012. (*See ¶¶ 30-45 pages 7-10 of* A83-113). Thus the Navy and PIC was aware that Eric Campbell, et al, was submitting fraudulent PIC bonds as early as November, 2012. (A83-113).

## SUMMARY OF ARGUMENT

The Navy's termination for default on contracts Range 409, P559, and P105 was improper under 48 C.F.R §52.249-10(a) because AECI did not fail to perform any part of the contracts.

The Navy's termination for default on contracts Range 409, P559, and P105 was improper under FAR 52-228-15 because AECI provided proper bonding on the projects.

The Navy's termination for default on contracts Range 409, P559, and P105 was improper under FAR §52.228.2 because the Navy found the PIC replacement bonds to be acceptable which led to their approval and the release of the Liberty Bonds.

The factual circumstances in *Airport Industrial v. U.S.,* are significantly different than those in the instant case and cannot support AECI's termination for default on contracts Range 409, P559, and P105.

The Navy's termination for default on contracts Range 409, P559, and P105 was improper under 48 C.F.R. 52-249-10(b) because acts of the Government in its sovereign or contractual capacity caused AECI the inability to procure bonds on the projects.

The Navy had Superior Knowledge that Eric Campbell was Submitting Fraudulent PIC Bonds before the incident with AECI, as fraudulent bonds had been submitted to the Navy on a construction project in Florida.

The Navy owed a duty to AECI to adequately investigate the replacement bonds because proper bonding is a requirement to proceed on government contracts and absent a non-negligent investigation, AECI cannot properly proceed and wrongfully bears the risk of being terminated on a contract for actions of the government that are out of its control.

The Navy materially breached Range 409, P559, and P105 by conducting a negligent investigation into the validity of the PIC replacement bonds which caused the valid Liberty Bonds to be released.

The Navy breached their implied obligation of good faith and fair dealing by conducting a negligent investigation into the validity of the PIC replacement bonds and thereby interfering with AECI's performance and expectation on the Range 409, P559, and P105 contracts.

## **STANDARD OF REVIEW**

The United States Appeals Court for the Federal Circuit reviews a decision by the Court of Federal Claims to dismiss a complaint for failure to state a claim upon which relief could be granted under RCFC 12(b)(6) *de novo*. *Hearts Bluff Game Ranch, Inc. v. United States*, 669 F.3d 1326, 1328 (Fed. Cir. 2012). "The

27

question that this Court must answer in reviewing a dismissal order in such a case is whether the trial court was correct in concluding that the facts asserted by the plaintiff do not entitle him to a legal remedy." *Sommers Oil Co. v. United States*, 241 F.3d 1375, 1378 (Fed. Cir. 2001). When reviewing a dismissal for failure to state a claim upon which relief can be granted the Federal Circuit must accept as true all the factual allegations in the complaint. *Id*. A trial court should not dismiss a complaint for failure to state a claim unless it is "beyond doubt that the plaintiff can prove no set of facts which would entitle him to relief." *Id*.

## Federal Legal Standard for a Motion to Dismiss

A pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." *RCFC 8(a)(2)*. The "pleading standard ... does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal (Iqbal),* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly (Twombly),* 550 U.S. 544, 555 (2007) (interpreting pleading standards under identical *Fed.R.Civ.P. 8(a)(2)*)).

The "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Iqbal,* 556 U.S. at 678, 129 (quoting *Twombly,* 550 U.S. at 570, 127). When evaluating a motion to dismiss for failure to state a claim upon which relief can be granted under RCFC 12(b)(6), the

court must accept the allegations contained in the complaint as true and construe them in the manner most favorable to the non-moving party. *Cedars–Sinai Med. Ctr. v. Watkins,* 11 F.3d 1573, 1584 n. 13 (Fed.Cir.1993). The court's 12(b)(6) inquiry is limited to examining the facts pled in the complaint. *See Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys., Inc.,* 988 F.2d 1157, 1164 (Fed.Cir.1993).

## ARGUMENT

### I.     AECI'S TERMINATION FOR DEFAULT WAS IMPROPER UNDER 48 C.F.R §52.249-10(a), FAR 52-228-15, FAR §52.228.2, AIRPORT INDUSTRIAL v. US, and 48 C.F.R. 52-249-10(b).

A trial court should not dismiss a complaint for failure to state a claim unless it is "beyond doubt that the plaintiff can prove no set of facts which would entitle him to relief." *Sommers Oil Co.*, 241 F.3d at 1378.

The Navy wrongfully terminated AECI for default based on the theory that AECI was in violation of 48 C.F.R §52.249-10(a), FAR 52-228-15, FAR §52.228.2, *Airport Industrial v. U.S*., and 48 C.F.R. 52-249-10(b) because: 1) AECI's termination was not based on AECI's performance or failure to perform its work under the contracts; 2) AECI performed its duty in providing bonding to the Navy for approval;  3) the Navy found the PIC bonds to be "acceptable" even though they were fraudulent; 4) AECI's factual circumstances are significantly different than those in *Airport Industrial v. US*; and 5) a termination for default

29

cannot stand where acts of the Government in either its sovereign or contractual capacity cause a delay in work.

### A. Where There is No Issue With Work Performance The Navy Cannot Terminate A Contract for Default Under 48 C.F.R. §52.249-10(a)

The language in 48 C.F.R 52.249-10(a) is indelibly clear that the Navy may only terminate a contract for a contractor's failure to perform. The Navy terminated AECI for default on all three fixed-price construction contracts pursuant to 48 C.F.R. §52.249-10(a), which states:

> If the Contractor refuses or fails to prosecute the work or any separable part, with the diligence that will insure its completion within the time specified in this contract including any extension, or fails to complete the work within this time, the Government may, by written notice to the Contractor, terminate the right to proceed with the work (or the separable part of the work) that has been delayed.

48 C.F.R. §52.249-10(a)

AECI's termination for default was improperly based on 48 C.F.R. §52.249-10(a) as AECI's was not terminated for refusing or failing to "…prosecute the work or any separable part." AECI was terminated for its failure to provide a third set of bonds after the Navy negligently investigated and approved the PIC bonds when they were fraudulent. (A80-82, A176-178, A234-236). The Navy has failed to offer evidence alleging that AECI has failed to perform or prosecute the work on all three contracts. After blithely ignoring its own negligence, the Navy terminated

AECI for default on the sole basis that AECI was unable procure additional payment and performance bonds.

To hold that the Navy can terminate for default under 48 C.F.R. §52.249-10 is to ignore 200 years of statutory interpretation and shoehorn a meaning into a regulation where none exists. '[W]here Congress has clearly stated its intent in the language of a statute, a court should not inquire further into the meaning of the statute.'" (quoting *Millenium Lumber Distrib., Ltd., v. United States*, 558 F.3d 1326, 1328 (Fed. Cir. 2009), *reh'g denied* 2009)); *Am. Airlines, Inc. v. United States*, 551 F.3d 1294, 1300 (Fed.Cir.2008), *reh'g granted*, 319 Fed.Appx. 914 (Fed. Cir. 2009)). Thus, when the "'statute's language is plane, "the sole function of the court is to enforce it according to its terms." ' " *Id.* (citations omitted).

The language in 48 C.F.R. §52.249-10 is indisputably clear that the Navy may only terminate a contract if a contractor "… refuses or fails to prosecute the work or any separable part…." Miller Act bonds are required under a completely different set of regulations and as such, 48 C.F.R. §52.249-10 cannot provide the basis for AECI's termination for default for Miller Act bond issues.

**B.**  **Where There Is No Issue With Performance and Payment Bonds at the Outset of Performance The Navy Cannot Terminate A Contract for Default Under FAR Clause 52-228-15**

Another basis by which the Navy terminated AECI for default was AECI's alleged inability to comply with FAR Clause 52-228-15 Performance and Payment Bonds—Construction:

> Unless the resulting contract price is $150,000 or less the successful offeror shall furnish performance and payment bonds to the contracting officer

AECI furnished to the Navy valid Liberty bonds at the outset of its award of the three contracts. (A35-39, A179-195, 197-199). The Navy accepted these valid Liberty bonds after a period of investigation on all three contracts. (A35-39, A179-195, 197-199). AECI fully complied with FAR Clause 52-228-15 by securing the Liberty bonds.  AECI sought the PIC replacement bonds in exchange for the Liberty Bonds and relied on the Navy to adequately investigate the PIC bonds so that they could continue work on the contracts. (A114-124, A146-150, A200-206). As a result of the Navy's negligent investigation, the Navy found the PIC bonds to be acceptable and released the Liberty bonds back to AECI on contracts Range 409 and P559. (A48, A151-155). On contract P105, the Navy negligently released the valid Liberty bonds before the PIC bonds had been approved and were still "under review." (A237).

The statutory language of FAR Clause 52-228-15 has not been interpreted to authorize the Navy to terminate a contractor for default when the absence of bonding on a project is due to the negligence of the government. To hold otherwise would serve an injustice upon AECI and all contractors. If performance and payment bonds are required by contractors before starting performance and through the duration of performance, contractors should be able to rely on the government entity's investigation of these bonds. When the government fails to conduct an investigation according to their own protocol, the contractor should not have to bear the risk of such negligent investigation.

AECI complied with FAR Clause 52-228-15 by securing the Liberty bonds on all three contracts. AECI did not violate FAR Clause 52-228-15 by providing the Navy with PIC replacement bonds, as it was the duty of the Navy to investigate the bonds according to internal policies not AECI. The Navy's own negligent actions led to the release of the otherwise valid Liberty bonding on all three contracts. The negative attention surrounding the Navy's negligent acceptance of fraudulent bonds and the release of the valid Liberty bonds, interfered with AECI's ability to secure additional replacement bonding. Therefore, AECI was improperly terminated for default by the Navy under FAR Clause 52-228-15.

### C. Where the Navy found the Replacement Bonds Acceptable, The Navy Cannot Terminate a Contract for Default Under FAR §52.228.2.

The third basis for the Navy's termination of AECI for default on the three

contracts with AECI for default was FAR Clause §52.228.2 Additional Bond

Security:

> The Contractor shall promptly furnish additional security
> required to protect the Government and persons
> supplying labor or materials under this contract if— Any
> surety upon any bond, or issuing financial institution for
> other security, furnished with this contract becomes
> unacceptable to the Government

FAR §52.228.2

FAR §52.228.2 could not provide a basis for AECI's termination for default.

When AECI presented the replacement bonds to the Navy, the Navy allegedly

conducted an investigation into their validity and thereafter <u>accepted</u> the

replacement bonds. (A48, A151-155, A213). The Navy's acceptance of the

replacement bonds subsequently released the former Liberty Bonds on contracts

Range 409 and P559. The Liberty bonds had been released on P105 before the

Navy even completed their investigation into the validity of the PIC bonds.

(A237).

Because the Navy accepted the replacement bonds and thereafter released

AECI's previous valid bonds, the Navy's termination of AECI for default should

not be able to stand on the theory that the replacement bonds became

34

"unacceptable" to the Navy under FAR §52.228.2. Had the Navy conducted the proper investigation into the replacement bonds, they would not have found the replacement bonds "acceptable" and would not have subsequently released the valid Liberty Bonds. The Navy should be estopped from using FAR §52.228.2 as a basis for termination for default when its own negligent actions contributed to it finding that the PIC bonds were "acceptable" in the first place.

### D. The Circumstances of AECI's Termination for Default Do Not Fit Within the Bright Line Test of *Airport Industrial v. US.*

Decisions of the boards of contract appeals appear to have historically held that a failure to furnish adequate bonding required by a government procurement contract is a breach that justified termination for default. *Airport Industrial Park, Inc. v. United States*, 59 Fed. Cl. 332, 334 (2004) (citations omitted). In *Airport Industrial Park*, the government terminated the contract for default when the company that provided the performance and payment bonds became insolvent before the contract had been completed and the contractor was unable to procure additional bonds. *Id.* There are no circumstances in *Airport Industrial Park* or in the string cite of cases cited by *Airport Industrial Park* where the United States was at fault in causing the contractor an inability to produce bonds.

AECI's factual circumstances are significantly different, namely the Navy was the direct cause of the circumstances that lead to the lack of bonding for the

contracts. Unlike *Airport Industrial Park*, AECI's original surety bonds were valid throughout the duration of the contracts. In fact, even after the PIC bonds were deemed invalid, the release of the Liberty bonds could have been rescinded by the Navy.

Whereas in *Airport Industrial Park*, the Army Corps of Engineers did not play a role in *Airport's* inability to provide bonds while the Navy played a substantial role in the acceptance of the PIC bonds in replacement of the Liberty bonds. The Navy's approval of the fraudulent PIC bonds, release of the Liberty bonds, and AECI's subsequent inability to procure bonds following the incident because of negative exposure, was beyond AECI's control and without AECI's fault or negligence. The Navy failed to follow their own regulations and FAR clauses regarding the investigation of surety bonds. Therefore, *Airport Industrial Park*, does not support the Navy's termination of AECI for default.

### E.    AECI'S Termination for Default was Improper Under 48 C.F.R. 52-249-10(b).

In accordance with 48 C.F.R. 52-249-10(b), the Contractor's right to proceed shall not be terminated nor the Contractor charged with damages under this clause if:

> (1) the delay in completing the work arises from unforeseeable causes beyond the control and without the fault or negligence of the Contractor. Examples of such causes include (i) acts of God or the public enemy, (ii) acts of the Government in either its sovereign or contractual capacity…

48 C.F.R. 52-249-10(b)

Under applicable law, "'acts of the [g]government in either its sovereign or contractual capacity' may form the basis for concluding that a contractor's alleged default was excusable." *United Partition Systems, Inc. v. United States*, 90 Fed. Cl. 74, 90 (2008) (quoting *United Partition*, 59 Fed.Cl. at 641(quoting FAR § 52.249-10(b)(1)(ii) (1999))). Acts of the Government's Contracting Officer can be viewed acts of the government within its sovereign or contractual capacity. See *Id.* at 85-86.

The Navy's investigation into the validity of the PIC bonds is replete with "acts of the government" undertaken by the various Navy contracting officers. First, the CO's decision to contact "Campbell" instead of following protocol and using the Circular 570 contact information for PIC. Second, the Navy's apparent failure to send any form of notice directly to PIC. The Navy's actions in not forwarding the request for authentication to PIC was in direct conflict with NAVFAC P-68 Contracting Manual which very clearly prohibits the Navy from contacting the surety's agent for Miller Act payment and performance bond authentication.

> **28.102** Performance and payment bonds and alternative payment protections for construction contracts.
> **28.102-1** General.
> (b) For contracts over $500,000, copies of the payment and performance bonds shall be forwarded to the surety (not the agent's office) for authentication. A copy of this request to the surety shall be sent to the contractor.
> **28.106-2** Substitution of Surety bonds

> A Level III contracting officer approval is required prior to
> substituting the original bond with a new surety bond covering
> all or part of the obligations on the previously approved bond.

Lastly, the Navy unreasonably refused to demand the return of the Liberty

bonds when the Navy had an opportunity to rescind the release of the bond when

PIC notified the Navy that the PIC bonds were invalid. Liberty sent a letter to the

Navy confirming the replacement and cancellation of the Liberty Bonds by the Pic

bonds on all three contracts, requesting any "contrary understandings" be brought

to the attention of Liberty within seven days. (A49-55, A156-161, A214-216). The

Navy received notice from PIC that the PIC bonds were invalid with enough time

to rescind the release of the Liberty bonds on all three contracts.

However, on the same day, the Navy failed to inform Liberty that the

cancellation of its Liberty Bonds was being rescinded as a result of the invalid PIC

bonds. The acceptance of the PIC bonds by the Navy was a nullity due to their

invalid nature and thus the cancellation of the Liberty bonds was null as well and

should have been rescinded by the Navy. The Navy had a clear chance to not only

protect themselves by rescinding the cancellation of the Liberty bonds but also had

a chance to protect AECI from being terminated on the contracts.

## II.   THE NAVY HAD SUPERIOR KNOWLEDGE THAT ERIC CAMPBELL WAS SUBMITTING FRAUDULENT PIC BONDS

A trial court should not dismiss a complaint for failure to state a claim unless it is "beyond doubt that the plaintiff can prove no set of facts which would entitle him to relief." *Sommers Oil Co.*, 241 F.3d at 1378.

"[W]hile the [government] had no obligation to prevent (and, indeed, was free to precipitate) the avalanche that buried the contractor, it was not free, if it was aware of the impending avalanche and knew that [the contractor] was not, to stand aside and let the bidder be overwhelmed without a warning." *J.A. Jones Const. Co. v. U.S.*, 390 F.2d 886, 888 (Ct.Cl.1968). The United States Court of Appeal for the Federal Circuit has held that an individual with appropriate contracting authority may have knowledge imputed to him or her. *Blue Cross & Blue Shield United of WI & Subsidiaries v. United States*, 71 Fed. Cl. 641, 660 (Fed. Cl. 2006), citing *Gisler v. United States*, 232 F.3d 864, 869 (Fed.Cir.2000).

A 2013 lawsuit brought on behalf of the Federal Insurance Company and Pacific Indemnity Company against Eric Campbell, The Individual Surety Group, Steve Stokeling, and First Fidelity Asurety Company, provides evidence that the Navy had knowledge that Eric Campbell was submitting fraudulent PIC bonds as early as November 2012. (A83-113). On October 26, 2012, a Florida Construction Company GCC Enterprises obtained performance and payment bonds for a project at the Naval Air Station Pensacola which turned out to be fraudulent. This

indicates one instance where the Navy had already direct knowledge of the

fraudulent nature of bonds being issued by certain agents alleging to be agents of

PIC, specifically an agent by the name of "Campbell."

Unexplained by the Navy is how the Navy would authenticate PIC bonds

that had already been apparently determined by the Navy to be fraudulent as early

as November 2012. The full extent of the Navy's knowledge is unknown at this

time and would be the subject of discovery. However, as can be seen in the 2013

PIC *Complaint* and as alleged in the AECI *Complaint(s)*, it cannot be disputed that

a contractor used the fraudulent PIC bonds on a Navy project. This fact, accepted

as true, provides a claim for relief that is "plausible on its face."

### III.  THE NAVY OWED A DUTY TO AECI TO ADEQUATELY INVESTIGATE THE REPLACEMENT BONDS

A trial court should not dismiss a complaint for failure to state a claim unless

it is "beyond doubt that the plaintiff can prove no set of facts which would entitle

him to relief." *Sommers Oil Co.*, 241 F.3d at 1378.

A review of Section 19 in the General Requirements of the contracts

explicitly states that "… the contractor shall furnish for Government review and

approval…payment and performance bonds" (emphasis added). Also found within

Section 19 is FAR clause 52.228-15 which refers to Treasury Circular 570 as the

proper location for approved corporate sureties and their contact information and

bonding limits. (A46-47). Implied within Section 19 is the fact that a "review and

approval" would take place by the Navy in some standard or regulated method designed to serve a contractual and statutory bonding purpose of "…provid[ing] the Government with 'financial protection against losses under contracts,' and shield the Government from [risk]…"

AECI does not dispute that the purpose of payment and performance bonds is for the benefit and protection of the government. However, AECI disputes the notion that the government does not owe a duty to contractors when performing their investigation of payment and performance bonds.

All contractors are required to furnish payment and performance bonds when awarded a contract over a certain dollar amount. If a contractor fails to furnish these payment and performance bonds, they will lose and/or be terminated from the contract. Because the payment and performance bonds are a condition to starting and continuing performance on a contract, the Navy has a duty to not only carefully investigate the bonds for their own benefit but also for the benefit of the contractor who cannot start performance until the bonds are approved. It is contrary to the clauses own purpose for the government to negligently investigate the bonds. As in this case, a negligent investigation by the government may lead to the approval of fraudulent bonds, thereby exposing both the government and the contractor to losses.

Without a meaningful review and approval of payment and performance bonds, the incidence of fraud is likely to greatly increase. Under the cursory review and approval suggested by the United States, payment and performance bonds only need to look like payment and performance bonds—i.e. if the numbers are in the correct amounts, on the correct forms, and you speak with a warm body claiming to be the surety, then the view is complete. This frustrates both the purpose of protecting the government from risk and additionally gives the government unfettered discretion in how it will investigate performance and payment bonds, leaving the contractor vulnerable to a termination for default for actions it had no control over.

### IV. THE NAVY MATERIALLY BREACHED THE CONTRACT BY NEGLIGENTLY INVESTIGATING THE PIC REPLACEMENT BONDS AND RELEASING THE LIBERTY BONDS

A trial court should not dismiss a complaint for failure to state a claim unless it is "beyond doubt that the plaintiff can prove no set of facts which would entitle him to relief." *Sommers Oil Co.*, 241 F.3d at 1378.

"A breach is material when it relates to a matter of vital importance, or goes to the essence of the contract." *See Thomas v. Dep't of Hous. and Urban Dev.,* 124 F.3d 1439, 1442 (Fed.Cir.1997) (citing 5 Arthur L. Corbin, *Corbin on Contracts* § 1104 (1964)). Whether a particular breach is material "depends on the nature and effect of the violation in light of how the particular contract was viewed, bargained

for, entered into, and performed by the parties." *Hansen Bancorp, Inc. v. United States*, 367 F.3d 1297, 1312 (Fed.Cir.2004) (*quoting Stone Forest Indus. Inc. v. United States*, 973 F.2d 1548, 1551 (Fed.Cir.1992)).

The Restatement (Second) of Contracts § 241(e) (1981) states that, "the extent to which the behavior of [a] party failing to perform ... comports with standards of good faith and fair dealing" is a significant factor in determining whether that party's breach is material. The Restatement also states that "[s]ubterfuges and evasions violate the obligation of good faith," as does lack of diligence and interference with or failure to cooperate in the other party's performance. *Malone v. United States*, 849 F.2d 1441, 1445 *modified,* 857 F.2d 787 (Fed. Cir. 1988), citing *Restatement (Second) of Contracts* § 241(e) (1981).

The Navy is required to conduct an investigation into the acceptability of payment and performance bonds on all construction projects as set out in paragraph 28.102-1 of the Navy Procedural Regulations. The Navy failed to follow protocol of 28.102-1(b) by verbally confirming the authenticity of the PIC bonds with the agent who perpetrated the fraud, "Ed Campbell of Pacific Indemnity Company" on Contracts Range 409 and P559, and failing to personally authenticate the bonds at all for Contract P105. The Navy failed to follow 28.102-1(b) by requesting a confirmation email from the agent who forged the fraudulent PIC (P559), and requesting that the agent who perpetrated the fraud forward the

bond authenticity requests directly to PIC (Range 409), rather than contracting PIC directly via the Pacific Indemnity's Treasury Circular 570 address. Further, the Navy tried to pass off its duty of inspection on Contract 105 by instructing AECI to forward the bond authenticity requests directly to PIC.

The Navy materially breached the contracts by failing to investigate the replacement bonds in a non-negligent manner, a duty which led to the Navy's approval of fraudulent bonds and the release of the former non-fraudulent bonds. The lack of diligence on behalf of the Navy when investigating the PIC replacement bonds materially interfered with AECI's ability to perform on the contracts. AECI had a reasonable expectation that the Navy would follow all required protocols when investigating the replacement bonds in order to protect themselves and to ensure AECI's continued performance on the contract. Had the Navy followed the requirements set out in NAVFAC P-68, it is more likely than not that the fraudulent nature of the bonds would have been discovered before the Navy accepted them. The Navy should not be allowed to shield itself from liability under the theory that FAR clauses and the Navy Contracting Manual are for its own benefit when 1) they fail to follow the protocols set out in these clauses and Manuals to protect themselves and 2) the contractor unjustly bears the risk of the government's negligent investigation, actions the contractor has no control over.

## V. THE NAVY'S ACTION ARE IN BREACH OF THE IMPLIED OBLIGATION OF GOOD FAITH AND FAIR DEALING

A trial court should not dismiss a complaint for failure to state a claim unless it is "beyond doubt that the plaintiff can prove no set of facts which would entitle him to relief." *Sommers Oil Co.*, 241 F.3d at 1378.

"Every contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement." *Metcalf Const. Co., Inc. v. United States*, 742 F.3d 984, 990 (Fed. Cir. 2014) citing Restatement (Second) of Contracts § 205 (1981). "The covenant of good faith and fair dealing ... imposes obligations on both contracting parties that include the duty not to interfere with the other party's *performance* and not to act so as to destroy the *reasonable expectations* of the other party regarding the *fruits of the contract.*" *Metcalf Const.*, 742 F.3d at 991 citing *Centex Corp. v. United States,* 395 F.3d 1283, 1304 (Fed.Cir.2005). "The implied duty of good faith and fair dealing is limited by the original bargain: it prevents a party's acts or omissions that, though not proscribed by the contract expressly, are inconsistent with the contract's purpose and deprive the other party of the contemplated value." *Metcalf Const.* 742 F.3d at 991 citing *First Nationwide Bank v. United States,* 431 F.3d 1342, 1350 (Fed.Cir.2005).

The actions of the Navy deprived AECI of the contemplated value of the Range 409, P559 and P105 contracts. AECI had an expectation that the Navy would dutifully investigate the PIC replacement bonds in order to not only protect

the government, but to ensure AECI's continued performance on the contracts. In order to proceed with contract performance, AECI had a duty to provide payment and performance bonds just as the Navy had a duty to investigate these bonds and not blindly approve them. It is inconsistent with the purpose of the Range 409, P559, and P105 contracts and the several FAR clauses to shift the risk of failing to properly investigate the performance and payment bonds to the contractor. AECI did all they were required to do, i.e. provide bonds. The rest was up to the Navy. If, as it has been argued, the purpose of the bonds are solely for the protection of the government, the government should not be able to avoid liability if they do not take the steps necessary to ensure they are protected.

## VI.   <u>CONCLUSION</u>

The Navy had a duty by regulation and statute to investigate and approve Miller Act payment and performance bonds. The Navy was clearly negligent in its investigation of the validity of Miller Act payment and performance bonds and thereafter, without any reasonable justification, held AECI responsible for the Navy's negligent investigation.

Neither *Airport Industrial* nor the cases cited by it, clearly analyzes the language within 48 C.F.R. § 52.249-10(a). If one reads and closely analyzes the cases cited by *Airport Industrial* one comes away with the firm conviction that the

various Boards and the court simply did not address the plain language in 48 C.F.R. § 52.249-10(a).

What is clear and therefore a material fact that cannot be disputed is that the Navy clearly understood that the Navy had the sole responsibility for investigating, authenticating, approving, and accepting replacement Miller Act payment and performance bonds. AECI is entitled as a matter of law to presume that when the Navy investigated and approved the PIC bonds that the Navy used the vast resources available to the Navy's contracting officers and, like all government officials, the various contracting officer performed their duties correctly and in good faith. *Atkins North America, Inc. v. U.S.*, 106 Fed.Cl. 491, 506 (2012); *See Schism v. United States,* 316 F.3d 1259, 1302 (Fed.Cir.2002) (en banc) ("This presumption of regularity is the supposition that public officers perform their duties correctly, fairly, in good faith, and in accordance with law and governing regulations, and is valid and binding unless 'well-nigh irrefragable proof rebuts or overcomes it.' " (citation omitted) (quoting *Alaska Airlines, Inc. v. Johnson,* 8 F.3d 791, 795 (Fed.Cir.1993))).

AECI's lack of responsibility in creating the PIC bonds and the circumstances surrounding the PIC bonds should lead to AECI being terminated for convenience and not for default. When an illegality is not obvious, a contractor should be accorded the benefit of all reasonable doubts and the contract terminated

for the convenience of the government. *John Reiner & Co. v. United States,* 163 Ct.Cl. 381, 325 F.2d 438, 440 (Ct.Cl.1963).

A trial court should not dismiss a complaint for failure to state a claim unless it is "beyond doubt that the plaintiff can prove no set of facts which would entitle him to relief." *Sommers Oil Co.*, 241 F.3d at 1378. Taking in consideration all the facts and inferences drawn in AECI's favor, it is clear that dismissal of the Range 409, P559, and P105 *Complaints* by the United States Court of Federal Claims was improper. A complete review of the FAR clauses show that AECI's claim has *facial plausibility* since with reasonable inferences it's entirely logical that the Navy's acts and omissions represent an excuse preventing the Navy from terminating for default. To say to [AECI], 'The joke is on you. You shouldn't have trusted us,' is hardly worthy of our great government." See *Maxima Corp. v. United States,* 847 F.2d 1549, 1556 (Fed.Cir.1988); *see also Brandt v. Hickel,* 427 F.2d 53, 57 (9th Cir.1970).

AECI respectfully requests this Court reverse the dismissal of the Range 409, P559, and P105 *Complaints* and allow the cases to proceed to discovery.

///

///

///

///

Respectfully submitted,

Dated:  August 11, 2014          BRUCKNER LAW FIRM

                                 By: /s/ William L. Bruckner
                                 William L. Bruckner
                                 Chelsey N. Del Testa
                                 4550 Kearny Villa Road, Suite 209
                                 San Diego, CA 92134
                                 (858) 565-8300 telephone
                                 (858) 565-0813 facsimile

                                 Attorneys for Allen Engineering Contractor, Inc.

CASE PARTICIPANTS ONLY

# ADDENDUM

**ADDENDUM**

Order of the United States Court of Federal Claims,
Case No. 13-684C, Dated March 27, 2014…………………………………Ad-1-18

Order of the United States Court of Federal Claims,
Case No. 13-695C, Dated May 8, 2014 ………………..………...……….Ad-19-20

Order of the United States Court of Federal Claims,
Case No. 13-720C, Dated May 8, 2014 ………...…………………..……..Ad-21-22

# In the United States Court of Federal Claims

No. 13-684 C

(Filed March 27, 2014)

|  |  |  |
|---|---|---|
| ALLEN ENGINEERING | ) | |
| CONTRACTOR, INC., | ) | Construction Contract; Fraudulent |
| Plaintiff, | ) | Performance and Payment Bonds; Prior |
| v. | ) | Material Breach; Violation of |
|  | ) | Regulations; Default Terminations; |
| THE UNITED STATES, | ) | Equitable Estoppel. |
| Defendant. | ) | |

*William L. Bruckner*, Bruckner Law Firm, San Diego, California for plaintiff.

*Eric E. Laufgraben*, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., with whom were *Stuart F. Delery*, Assistant Attorney General, *Bryant G. Snee*, Acting Director, *Donald E. Kinner*, Assistant Director, for defendant. *Stephen Tobin*, of counsel.

## ORDER

**Merow**, *Senior Judge*

In its complaint, plaintiff alleges that the government, under several theories of liability, improperly terminated a contract between the parties involving construction work at Marine Corps Base, Camp Pendleton, California. *See* Doc. 1. The government has moved the court to dismiss the complaint in its entirety, arguing that plaintiff has failed to state any claim on which relief may be granted. *See* Doc. 7. The court finds as follows.

## I. FACTS

The parties executed a contract for construction work at Camp Pendleton on July 29, 2012. *See* Doc. 1, ¶ 4. Plaintiff provided the required performance and payment bonds from Liberty Mutual Insurance Company ("Liberty") to the Navy on August 20, 2012. *See id.*, ¶ 8. After initially rejecting the bonds, the Navy ultimately accepted them by letter dated September 6, 2012. *See id.*

On February 13, 2013, plaintiff submitted a second set of bonds, from Pacific Indemnity Company ("PIC"), and asked that if the PIC bonds were approved by the Navy, that they be substituted for the Liberty bonds. *See id.*, ¶ 9. Plaintiff acquired the PIC bonds from Individual Surety Group, LLC ("ISG"), a company which represented itself as a broker for PIC, a subsidiary of Chubb Group. *See id.*   Plaintiff alleges that upon receipt of the PIC bonds, the Navy began an investigation into whether the bonds were an acceptable substitute for the Liberty bonds. *See id.*, ¶ 11.

The Navy verbally confirmed the authenticity of the bonds by calling a man named Ed Campbell, who allegedly worked for PIC. *See id.*, ¶ 12.   Plaintiff believes that the Navy actually spoke to Eric Campbell, a purported representative of ISG. *See id.*, at n.3.   Plaintiff further believes that the Navy did not call the telephone number for PIC listed in the Treasury Circular 570. *See id.*, ¶13.   The Navy followed this verbal confirmation with a letter, dated March 14, 2013, requesting written confirmation that the PIC bonds were authentic. *See id*, ¶ 12. Plaintiff alleges that the Navy did not contact the proper person for authentication and that the Navy did not actually send the letter requesting written confirmation to PIC, in violation of its duty to do so under certain Navy regulations, Federal Acquisition regulations, and other federal laws. *See id.*

The Navy approved the PIC bonds and the Liberty bonds were returned to Liberty on April 10, 2013. *See id.*, ¶ 14. In the complaint, Plaintiff alleges that the Navy sent the Liberty bonds back to Liberty, but Exhibit F to the same complaint indicates otherwise.  Liberty sent a letter to the Navy, dated May 2, 2013, stating: "Liberty's original performance and payment bonds for this contract (024039638), for which the new Pacific Indemnity bonds were substituted, have been returned to Allen Engineering Contractors, Inc., who has in turn forwarded the original bonds to Liberty." *Id.* at Exhibit F.  On May 2, 2013, Liberty notified PIC that the PIC bonds had been substituted for the Liberty bonds on the project. *See id.*, ¶ 15.  On May 6, 2013, Walter Maxwell of Chubb Group, informed plaintiff that the PIC bonds were not issued by PIC, and therefore, were invalid. *See id.* The next day, May 7, 2013, PIC informed the Navy that the bonds were invalid. *See id.*, ¶ 15. And on May 8, 2013, the Navy sent a letter to plaintiff stating that the PIC bonds were fraudulent, and requesting that plaintiff provide replacement bonds. *See id.*, ¶ 16.

On May 20, 2013, the Navy suspended performance of the contract and requested that plaintiff provide valid replacement bonds. *See id.*, ¶ 17.  In response,

Ad-002

plaintiff explained that it was having trouble securing replacement bonds, *see id.*, Exhibit I at 2, and proposed alternatives to allow the project to move forward, *see id.*, ¶ 18.

The Navy issued a cure notice on June 11, 2013, giving plaintiff 10 days to provide valid bonds. *See id.*, ¶ 18 and Exhibit J. And on June 17, 2013, the Navy rejected plaintiff's alternative proposals, stating that the suggestions did not meet the FAR bonding requirements. *See id.*, ¶ 19 and Exhibit K.

The Navy then issued a show cause letter on June 24, 2013, giving plaintiff a final opportunity to provide additional information relating to its failure to provide replacement bonds. *See id.*, ¶ 20 and Exhibit L. Plaintiff responded to the show cause letter on July 3, 2013, and again proposed alternatives to providing replacement bonds. *See id.*, ¶ 20 and Exhibit M. On July 10, 2013, the Navy issued a notice of termination for default. *See id.*, ¶ 20 and Exhibit N. Plaintiff alleges that at the time of termination, the project was 40% complete. *See id.*, ¶ 20.

Plaintiff also attaches to its complaint a copy of a lawsuit filed by Chubb against Eric Campbell, ISG and others, relating to fraudulent bonds. *See id.*, ¶ 22 and Exhibit O. Although plaintiff argues in its response to the government's motion to dismiss that the Navy "was fully aware" of Eric Campbell's fraudulent activity, and was therefore in a position to protect plaintiff, *see* Doc. 10 at 19 and 29, the complaint does not make any such allegation and the attached exhibits do not supply such facts.

Plaintiff alleges that throughout the bonding process, the Navy violated a variety of its own regulations contained in the Naval Facilities Engineering Command ("NAVFAC") Contracting Manual (NAVFAC P-68) and several FAR provisions, including the following: (1) the contracting officer, Leilani J. Murray, was not a Level III contracting officer, as required by Navy regulations, and was therefore unauthorized to approve the new bonds, *see* Doc. 1, ¶ 22 (The paragraphs in the complaint are mis-numbered, and include two paragraphs 22. This reference is contained in the second such paragraph.); (2) the Navy failed to contact the correct representative from PIC to authenticate the bonds, *see id.*; (3) the Navy failed to notify the surety and principal of the effective date of the new bonds, *see id.*, ¶ 23; (4) the Navy unreasonably refused to accept plaintiff's alternative proposals, *see id.*, ¶¶ 24 and 27; (5) the Navy improperly terminated the contract because 48 C.F.R. § 52.249-10 does not permit termination for failure to provide replacement bonds, *see id.*, ¶¶ 25, 26, and 28.

3

## II.   ANALYSIS

The government has moved the court to dismiss plaintiff's complaint under Court of Federal Claims Rule 12(b)(6), on the basis that it fails to state a claim upon which relief could be granted. *See* Doc. 7 at 1.  A complaint should be dismissed under Rule 12(b)(6) "when the facts asserted by the claimant do not entitle him to a legal remedy." *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002).  To survive a motion to dismiss, a complaint must contain factual allegations that are "enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  However, "[i]n ruling on a RCFC 12(b)(6) motion to dismiss, the court must accept as true the complaint's undisputed factual allegations and should construe them in a light most favorable to plaintiff." *Bristol Bay Area Health Corp. v. United States*, 110 Fed. Cl. 251, 259 (2013).

Despite the fact that the complaint enumerates only one cause of action, in the papers submitted to the court, plaintiff makes five discernable arguments for recovery.  Three appear in the complaint: (1) that the Navy violated a number of applicable regulations and committed a prior material breach by violating a duty it had to plaintiff in failing to properly investigate the validity of the PIC bonds and approve the substitution; (2) that the Navy improperly refused to accept plaintiff's alternative proposals to providing valid replacements for the fraudulent PIC bonds; and (3) that the Navy improperly terminated plaintiff's contract under FAR § 52.249-10, because this provision does not allow for termination for failure to provide replacement bonds.  And two are articulated in plaintiff's response to the motion to dismiss: (1) that the Navy had both the "last clear chance" and the superior knowledge to save plaintiff from its predicament, *see* Doc. 10 at 17-20, and (2) that the Navy should be equitably estopped from terminating the contract, *see id.* at 28-30.  Although the last two arguments appear only in plaintiff's response to the government's motion to dismiss, they are purportedly based on facts that are either alleged in the complaint or in documents attached to the complaint.  The court, therefore, will address the sufficiency of each theory in turn.

### A.   The Navy's Investigation of Bond Validity was Inadequate and Approval of the Replacement Bonds was Improper

Plaintiff alleges that its failure to provide valid replacement bonds for the fraudulent PIC bonds should be excused because of the Navy's actions. *See* Doc. 10 at 14-21.  Specifically, plaintiff claims that the Navy breached its obligations

4

under the contract and violated its own regulations and FAR provisions throughout the bonding process in the following respects:

(1) the Navy failed to contact the correct representative from PIC to authenticate the bonds, as stated in Department of the Treasury Circular 570, in violation of 48 C.F.R. § 28.202 and NAVFAC P-68 ¶ 28.102-1(b), which requires that the surety and not the bonding agent be contacted for authentication purposes;

(2) the Navy violated 48 C.F.R. § 28.106-2(a) and NAVFAC P-68 ¶ 28.106-2 by allowing someone other than a Level III contracting officer authorize the substitute bonds; and

(3) the Navy violated 48 C.F.R. § 28.106-2(b), by failing to notify the surety and principal of the effective date of the new bonds.

### 1. Prior material breach

According to plaintiff, the Navy's failure to conduct an adequate investigation of the PIC bonds amounts to a prior material breach such that plaintiff "was excused from providing replacement payment and performance bonds when the NAVY returned the LIBERTY BONDS after accepting the PIC BONDS based upon a negligent and invalid investigation in violation of the CONTRACT, FAR, NAVFAC regulations and the purpose of the Miller Act." Doc. 10 at 21.

Under the doctrine of prior material breach, "[u]pon a material breach of a contract the non-breaching party has the right to discontinue performance of the contract." *Precision Pine & Timber, Inc. v. United States*, 62 Fed. Cl. 635, 648 (2004) (citing *Stone Forest Indus., Inc. v. United States*, 973 F.2d 1548, 1550 (Fed. Cir. 1992)). In order for plaintiff to find shelter under this theory for its failure to provide replacement bonds, it must state a claim that the government breached a material term of the contract. Plaintiff has failed to do so.

The only contract term that the plaintiff cites is the requirement that the contractor furnish payment and performance bonds "for Government review and approval." *See* Doc. 10 at 16. The plaintiff argues that:

Implied within Section 19 [of the contract] is the fact that a "review and approval" would take place by the NAVY undertaken in some

Ad-005

standard, regulated method designed to, . . . serve the contractual and statutory bonding purpose of ". . . provid[ing] the Government with 'financial protection against losses under contracts,' and shield the Government from [risk] . . ."

*Id.* at 16 (citing the government's brief in support of its motion to dismiss).  By plaintiff's own admission, this provision is an obligation imposed on *plaintiff* under the contract as a measure of protection for the *government*—not an obligation that the government had to protect the plaintiff.

In order to find some obligation in this provision that the government has allegedly breached, plaintiff essentially asks the court to incorporate, in their entirety, the provisions of the FAR, the NAVFAC P-68, and the Miller Act into the contract to supply content to the phrase "review and approval."   Plaintiff offers no authority for such an incorporation, and the court declines to expand the contractual duties of the parties in such an extreme manner on the basis of the plaintiff's logic.  And as the Federal Circuit has held, wholesale incorporation is inappropriate since not every provision of the FAR is meant for the benefit of contractors.  *See Freightliner Corp. v. Caldera*, 225 F.3d 1361, 1365 (Fed. Cir. 2000).  Instead, "each regulation must be analyzed independently to determine whether it confers a cause of action upon the private contractor."  *Id.*

### 2.    Violation of regulations independent of contract terms

Plaintiff has likewise failed to state a claim for relief based on the Navy's alleged failure to abide by its internal regulations or the FAR, independent of the terms of the contract.  As an initial matter, "[i]n order for a private contractor to bring suit against the Government for violation of a regulation, that regulation must exist for the benefit of the private contractor."  *Id.* (citing *Cessna Aircraft Co. v. Dalton*, 126 F.3d 1442, 1451 (Fed. Cir. 1997); *Rough Diamond Co. v. United States*, 173 Ct. Cl. 15, 22-26 (1965).  As a corollary, if "the regulation exists for the benefit of the Government, then the private contractor does not have a cause of action against the Government in the event that a contracting officer fails to comply with the regulation."  *Id.*

### a.    Failure to contact the correct PIC representative

Plaintiff first argues that the Navy failed to contact the correct representative from PIC to authenticate the bonds, as identified in the Department of the Treasury Circular 570.  *See* Doc. 1, ¶ 13.  The Treasury Circular is referred to in both FAR §

Ad-006

28.202 and in NAVFAC P-68 ¶ 28.102-1(b).  In the complaint, plaintiff quotes FAR § 28.202(a)(1), which requires that sureties appear in Treasury Circular 570: "Corporate sureties offered for bonds furnished with contracts performed in the United States or its outlying areas must appear on the list contained in the Department of the Treasury Circular 570, 'Companies Holding Certificates of Authority as Acceptable Sureties on Federal Bonds and Acceptable Reinsuring Companies.'" 48 C.F.R. § 28.202(a)(1); *see* Doc. 1, ¶ 10.  Plaintiff then alleges that the contact information for each approved surety can be found in Treasury Circular 570. *Id.*

Plaintiff also alleges that the Navy violated NAVFAC P-68 ¶ 28.102-1(b), which requires that the surety and not the bonding agent be contacted for authentication purposes: "For contracts over $500,000, copies of the payment and performance bonds shall be forwarded to the surety (not the agent's office) for authentication.  A copy of this request to the surety shall be sent to the contractor."

To the extent that FAR § 28.202 affirmatively states any duty or required action on the part of the government, it requires only that the Navy made certain that the surety proposed by plaintiff appeared on Treasury Circular 570 as a condition of approving the bonds.  There is no dispute that PIC is, in fact, listed on the Circular. *See* Doc. 1, Exhibit D (portions of Treasury Circular 570 attached to plaintiff's complaint, including an entry for PIC).  Thus, this section has not plausibly been violated.  Plaintiff has also alleged, however, that the Navy is liable as a result of improperly contacting the agent's office rather than the surety, in violation of NAVFAC P-68 ¶ 28.102-1(b). *See* Doc. 1, ¶¶ 12-13.

Taking plaintiff's allegations as true, in order to make a valid claim for this failure, plaintiff must demonstrate that NAVFAC P-68 ¶ 28.102-1(b) was promulgated for its benefit.  As the government points out, the NAVFAC P-68 expressly states that it "provides general guidance to field contracting officers in the execution of their delegated authority," and that it "implements or supplements" the FAR, but "is not a stand-alone document." *See* Doc. 12 at 7 (citing Doc. 10, Attachment 2 at A028).  This statement clearly shows that this document was designed for the benefit of government employees, not private contractors.  Furthermore, there is nothing in the text of the specific section to indicate otherwise.  The essential function of performance and payment bonds is to protect the government's interests and the interests of suppliers of labor and materials, respectively. *See* 40 U.S.C. § 3131(b)(1) (stating that a "performance bond . . . [is] for the protection of the Government"); (b)(2) (stating that a "payment bond . . . [is] for the protection of all persons supplying labor and

7

material in carrying out the work provided for in the contract"). As such, ensuring that bonds are authentic logically serves the same interests. Because this regulation is evidently meant as a measure of protection for the Navy and for the suppliers engaged by plaintiff, but not to protect the plaintiff itself, plaintiff's claim for relief based on a violation of this section fails as a matter of law.

**b.    Failure to ensure substitute bonds authorized by a Level III contracting officer**

Plaintiff next argues that the Navy is liable for its failure to abide by FAR § 28.106-2(a) and NAVFAC P-68 ¶ 28.106-2. *See* Doc. 1, ¶ 22. When read together, these regulations require that a Level III contracting officer authorize substitute bonds. *See* 48 C.F.R. 28.106–2(a) ("A new surety bond covering all or part of the obligations on a bond previously approved may be substituted for the original bond if approved by the head of the contracting activity, or as otherwise specified in agency regulation."); NAVFAC P-68 ¶ 28.106-2, Doc. 10, Attachment 2 at A030 ("A Level III contracting officer approval is required prior to substituting the original bond with a new surety bond covering all or part of the obligations on the previously approved bond.").

In the complaint, plaintiff alleges that Leilani J. Murray, the officer who approved substitution of the PIC bonds for the Liberty bonds, is not a Level III officer. *See* Doc. 1, ¶ 22. Even assuming Ms. Murray was not the proper person to review the bond substitution in this case, the cited regulations do not provide plaintiff with a basis for asserting the Navy's liability. As explained above, the bonds at issue were not required for plaintiff's protection, therefore, the court will not assume that the regulatory provisions dealing with the authentication or approval of the bonds were meant to protect plaintiff. Here, no specific language in the text of the regulations alters that conclusion. Plaintiff, therefore, cannot sustain a claim against the government on this theory.

**c.    Failure to notify the surety and principal of effective date of new bonds**

Plaintiff further alleges that the government is liable for its failure to abide by the regulation that requires the government to "notify the principal and surety of the original bond of the effective date of the new bond," in cases of bond substitutions. 48 C.F.R. § 28.106–2(b); *see* Doc. 1, ¶ 23. The language of this regulation does suggest that it exists, at least in part, for plaintiff's benefit, since it required that the Navy provide notice to both plaintiff and Liberty of the effective

date of PIC substitution. Assuming that to be the case, however, it appears from plaintiff's own filings that the Navy in fact provided the required notice.

Among the exhibits to plaintiff's complaint are two letters. The first is a letter dated April 10, 2013, from the Navy to plaintiff copying PIC. *See* Doc. 1, Exhibit E. The letter states: "Receipt of performance and payment bonds numbered 02082013 is hereby acknowledged and approved. The surety, Pacific Indemnity Company, has authenticated your performance and payment bonds and you may commence work." *Id.* The second letter, dated May 2, 2013, from Liberty to the Navy copying plaintiff and PIC, states in relevant part: "Liberty Mutual Insurance Company is in receipt of your April 10, 2013 letter to Allen Engineering Contractor, Inc. confirming the Government's receipt and approval of substitute performance and payment bonds received from Pacific Indemnity Company (no. 02082013) . . ." *See* Doc. 1, Exhibit F at 1.

The first letter clearly states that the PIC bonds have been approved as substitutes for the Liberty bonds. And although the letter does not expressly contain the phrase "effective date," it is a small and reasonable inference that a letter dated April 10, 2013, that states the bonds have "hereby" been approved indicates effective approval as of April 10, 2013. And, despite the fact that Liberty was not formally copied on the Navy's April 10, 2013 letter, it is evident from the May 2, 1013 letter it actually received a copy. Thus, the Navy evidently met any obligations it had to notify plaintiff and Liberty under FAR § 28.106–2(b).

While it is true that the allegations in the complaint must generally be accepted as true for purposes of evaluating a motion to dismiss, "in the event of conflict between the bare allegations of the complaint and any exhibit attached pursuant to Rule 10(c), Fed.R.Civ.P., the exhibit prevails." *Fayetteville Investors v. Commercial Builders, Inc.*, 936 F.2d 1462, 1465 (4th Cir. 1991). Here, the exhibits to the complaint belie plaintiff's assertion that the Navy failed to provide proper notification. As such, the facts as alleged do not support the theory that the Navy violated FAR § 28.106–2(b).

## B.    The Navy Improperly Refused Plaintiff's Alternative Proposals

In its complaint, plaintiff alleges that "[t]he Navy's actions in refusing to accept any one of multiple solutions that would allow the construction of RANGE 409 to move forward and satisfy the FAR requirements was unreasonable and a breach of the obligation of good faith and fair dealing." Doc. 1, ¶ 24. Plaintiff more specifically claims that the Navy "unreasonably declined" the tripartite

9

escrow agreement that plaintiff proposed, pursuant to FAR § 28.102-1(b)(1)(iii), and refused to hold Liberty or PIC as sureties.  Doc. 1, ¶ 27.

"The covenant of good faith and fair dealing is an implied duty that each party to a contract owes to its contracting partner." *Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005).  Specifically, "[t]he covenant imposes obligations on both contracting parties that include the duty not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract." *Id.* (citations omitted).  As the Federal Circuit recently explained:

> the "implied duty of good faith and fair dealing cannot expand a party's contractual duties beyond those in the express contract or create duties inconsistent with the contract's provisions." . . . [O]ur formulation means simply that an act will not be found to violate the duty (which is implicit in the contract) if such a finding would be at odds with the terms of the original bargain, whether by altering the contract's discernible allocation of risks and benefits or by conflicting with a contract provision. The implied duty of good faith and fair dealing is limited by the original bargain: it prevents a party's acts or omissions that, though not proscribed by the contract expressly, are inconsistent with the contract's purpose and deprive the other party of the contemplated value.

*Metcalf Constr., Inc.  v. United States*, 742 F.3d 984, 991 (Feb. 11, 2014) (discussing application of the court's prior decision in *Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817 (Fed. Cir. 2010)).  This duty applies to both private parties and the government.  *See Centex*, 395 F.3d at 1304.

Plaintiff's only basis for claiming that the Navy violated its duty of good faith and fair dealing is the general allegation that the Navy was unreasonable in refusing to accept plaintiff's alternative proposals to providing valid bonds to replace the fraudulent PIC bonds.  *See* Doc. 1, ¶¶ 24, 27.  In order for the Navy's decision to amount to a violation, plaintiff must show that it had a reasonable expectation that the government would agree to the alternatives.  But neither the complaint, nor the attached exhibits, make even a facially plausible claim that such an expectation was reasonable.

In two letters attached to the complaint, in which it expressly "agrees that the NAVY and subcontractors/suppliers have a right to be protected," Doc. 1,

Exhibit I at 5, Exhibit M at 6, plaintiff outlines three alternatives to the Navy's requirement that it provide valid bonds: (1) that the Navy hold Liberty accountable; (2) that the Navy hold PIC accountable; and (3) that the Navy accept an escrow agreement and notice of assignment in place of bonds. *See* Doc. 1, Exhibit I at 3-5, Exhibit M at 4-6.

Plaintiff claims that the Navy should have accepted its proposed escrow agreement, pursuant to FAR § 28.102-1(b)(1)(iii). But, as the government correctly argues, escrow arrangements are only applicable to contracts valued between $30,000 and $150,000. *See id.*, Doc. 7 at 21. In the complaint, plaintiff alleges that the value of the contract at issue here far exceeds that range—at $2,855,419.00. *See* Doc. 1, ¶ 5. As such, plaintiff has no claim under this provision.

That leaves plaintiff with its claims that the Navy should take on the responsibility of holding either Liberty or PIC as sureties. Plaintiff not only requested the bond substitution that resulted in its current predicament, but also actually returned the Liberty bonds to Liberty. *See* Doc. 1, ¶ 9, Exhibit F at 1. And it is undisputed that the PIC bonds were forgeries, Doc. 1, ¶¶ 15-16, thus PIC was never obligated as a surety on the contract. Given these facts, plaintiff's position that the government could expect any protection from either set of bonds strains credulity. The court simply cannot see how the Navy's decision that it needed more security than plaintiff's alternatives offered either alters the allocation of risks and benefits under the contract, or conflicts with the contract terms.

To the extent that plaintiff means to argue that the Navy acted unreasonably or contrary to law in refusing plaintiff's alternatives independent of the covenant of good faith and fair dealing, its argument is equally unavailing. The Navy rejected plaintiff's proposals because they did "not comply with bonding requirements of FAR clause 52.228-15." Doc. 1, Exhibit K. *See also id.*, Exhibit L (reiterating plaintiff's failure to comply with FAR 52.228-15, and noting that plaintiff had "failed to cure the conditions endangering performance" under the contract); Exhibit N (terminating the contract for default due to plaintiff's failure to comply with FAR 52.228-15). Section 52.228-15, in relevant part, requires that:

> Amount of required bonds. Unless the resulting contract price is $150,000 or less, the successful offeror shall furnish performance and payment bonds to the Contracting Officer as follows:

11

(1) Performance bonds (Standard Form 25). The penal amount of performance bonds at the time of contract award shall be 100 percent of the original contract price.

(2) Payment Bonds (Standard Form 25-A). The penal amount of payment bonds at the time of contract award shall be 100 percent of the original contract price.

48 C.F.R. 52.228-15(b).   Plaintiff makes two excuses in the complaint for its failure to comply with this regulation.   First, it alleges that compliance with this provision after discovery of the fraud was unnecessary since it complied at the time the contract was executed by supplying the valid Liberty bonds. *See* Doc. 1, ¶ 26. This argument is addressed in the following section, discussing proper termination for failure to maintain bonds under 48 C.F.R. § 52.249-10.   Second, plaintiff claims that its non-compliance should be excused because the Navy failed to properly investigate the validity of the PIC bonds. *See id.*, ¶ 28. As considered at length above, however, the investigation that plaintiff claims the Navy was required to do was not meant for plaintiff's benefit, and therefore cannot form the basis of a valid claim.

### C.   The Navy Improperly Terminated Plaintiff's Contract under 48 C.F.R. § 52.249-10

The applicable regulation governing default on fixed-price construction states:

If the Contractor refuses or fails to prosecute the work or any separable part, with the diligence that will insure its completion within the time specified in this contract including any extension, or fails to complete the work within this time, the Government may, by written notice to the Contractor, terminate the right to proceed with the work (or the separable part of the work) that has been delayed.

48 C.F.R. 52.249-10(a). Here, the Navy terminated plaintiff's contract pursuant to this provision when plaintiff failed to provide replacements for the PIC bonds. *See* Doc. 1, Exhibit N at 1 (stating that the contract "is terminated for default under the clause FAR 52.249-10 ("Default" [April 1984] [sic] effective immediately"). The termination notice further explains that "[t]his notice of termination for default is based upon AECI's inability to comply with FAR Clauses 52-228-15 [sic]

12

Performance and Payment Bonds—Construction and 52.228-2 (Additional Bond Security)." *Id.*

As quoted above, section 52.228-15 states that a contractor "shall" furnish payment and performance bonds on contracts with a value exceeding $150,000, and that those bonds must cover 100% of the contract price. 48 C.F.R. 52.228-15(b). Section 52.228-2 imposes a duty on the contractor to furnish additional bond security in specified circumstances, including when "[a]ny surety upon any bond, or issuing financial institution for other security, furnished with the contract becomes unacceptable to the Government." 48 C.F.R. 52.228-2(a).

Plaintiff alleges in the complaint that the language of FAR § 52.249-10 does not allow the Navy to terminate a contract based on the contractor's failure to maintain performance and payment bonds, and thus does not apply to this case. *See* Doc. 1, ¶ 25. In the event that FAR § 52.249-10 does apply to the case, according to plaintiff, its non-compliance should be excused due to the Navy's failure to adequately investigate the validity of the PIC bonds. *See* Doc. 1, ¶ 28. Plaintiff also alleges that because it offered to "furnish additional security" in the form of the tripartite escrow agreement, it did not violate FAR § 52.228-2. *See* Doc. 1, ¶ 27.

In its motion to dismiss, the government argues that termination was proper under FAR § 52.249-10, citing this court's decision in *Airport Industrial Park, Inc. v. United States*, 59 Fed. Cl. 332 (2004). In *Airport Industrial Park,* the contractor obtained performance and payment bonds from a company that became insolvent prior to conclusion of the contract work. *Id.* at 333. The government notified the contractor that it must provide replacement bonds, and when it failed to do so, the government terminated the contract for default. *Id.* at 334. The court held, based on a review of numerous cases and board decisions, that "failure to furnish adequate bonding required by a government procurement contract is a material breach that justifies termination for default." *Id.* *See also Precision Pine & Timber, Inc. v. United States*, 62 Fed. Cl. 635, 647 (2004) (holding that the contractor materially breached the contract by failing to maintain bonding with an approved surety) (citing *Pac. Sunset Builders, Inc.,* ASBCA No. 39, 312, 93–3 B.C.A. (CCH) ¶ 25,923, 1993 WL 89769 (Mar. 17, 1993) (stating that when sureties became unacceptable to Government, appellant's failure to provide adequate financial information justified termination of contract for default) and *JaMar Constr. Co.,* ENG BCA No. 5251, 87–3 B.C.A. (CCH) ¶ 20,125, 1987 WL 41310 (Aug. 21, 1987) (finding a "material breach entitling the Government to

13

Case: 14-5094Case: 14-5094 Document: 75 Page: 18 Filed: 08/11/2014PARTICIPANTS ONLY Document: 75 Page: 18 Filed: 08/11/2014

Case 1:13-cv-00684-JFM   Document 15   Filed 03/27/14   Page 14 of 18

terminate the contract for default" when the contractor's surety went bankrupt and contractor could not obtain substitute bonding)).

These decisions, although not binding precedent, are clearly supported by the stated purpose of mandating bonds. The reason performance and payment bonds are required is to protect the government's interests and the interests of suppliers of labor and materials, respectively. *See* 40 U.S.C. § 3131(b)(1) (stating that a "performance bond . . . [is] for the protection of the Government"); (b)(2) (stating that a "payment bond . . . [is] for the protection of all persons supplying labor and material in carrying out the work provided for in the contract"). Allowing plaintiff to avoid default on the basis that it provided a valid bond at the time the contract was executed, notwithstanding the fact that the plaintiff requested that the Navy replace those valid bonds with bonds that later turned out to be fraudulent, would gut these statutory protections.

The conclusion that a contractor must maintain bonds throughout the contract term is also supported by a number of other FAR provisions. First, contractors cannot perform work without valid bonds. *See* 48 C.F.R. § 28.102-1(a) (stating that "The Miller Act (40 U.S.C. 3131 et seq.) requires performance and payment bonds for any construction contract exceeding $150,000"). Given the requirement that valid bonds are in place in order for a contractor to prosecute work under the contract, the lack of valid bonds would necessarily lead to the failure to prosecute work. Here, the Navy notified plaintiff on May 8, 2013 that the PIC bonds were fraudulent and must be replaced. *See* Doc. 1, Exhibit G. Shortly thereafter, because plaintiff failed to immediately provide replacement bonds, the Navy suspended work on the contract. *See id.*, Exhibit H. It was only after several more attempts to obtain valid bonds from plaintiff that the Navy actually terminated the contract. The failure to maintain the bonds or provide acceptable replacements, consequently, led to a direct violation of the express terms of FAR § 52.249-10(a).

In addition, section 52.228-2 requires a contractor to furnish additional bond security in specified circumstances, including when "[a]ny surety upon any bond, or issuing financial institution for other security, furnished with the contract becomes unacceptable to the Government." 48 C.F.R. 52.228-2(a). This is effectively a mechanism for ensuring adequate security is maintained throughout the contract term. Plaintiff's failure to provide additional security under this provision is, in part, the stated reason for the contract termination. Plaintiff's offer to provide an escrow agreement that is clearly unacceptable as security for

contracts exceeding $150,000, does not, as plaintiff alleges, amount to compliance with this provision.

Plaintiff offers no authority to support the proposition that a contractor is not required to maintain valid bonds throughout the term of the contract so long as it provides valid bonds at the beginning of the contract, and the force of logic weighs heavily against its position.   And for the reasons previously explained, any negligence plaintiff perceives in the Navy's investigation of the validity of the bonds does not excuse its default under FAR § 52.249-10.

**D.     The Navy Had the "Last Clear Chance" to Keep Liberty Bonds in Force or the Superior Knowledge to Protect Plaintiff**

In its response to the government's motion to dismiss, plaintiff argues, under two theories, that the Navy's superior knowledge imposed a duty on the Navy to protect the plaintiff.   First, plaintiff alleges that it was left without valid bonds due to the Navy's refusal to demand that Liberty return the original bonds. *See* Doc. 10 at 18-19.   Plaintiff claims that the Navy had the "last clear chance" to make such a demand based on Liberty's letter dated May 2, 2013. *See* Doc. 1, Exhibit F.   In that letter, Liberty confirmed the bond substitution and stated that it had cancelled the original performance and payment bonds. *See id.*   The portion of the letter that plaintiff apparently believes forms the basis of its argument is the final sentence, which reads: "Should you have any questions, comments or contrary understandings regarding the contents of this letter, please advise us within seven (7) days of the date of this letter," or by May 9, 2013. *Id.*   Plaintiff was copied on this letter, and presumably received it at the same time the Navy did.

According to the allegations in the complaint, a Chubb representative first informed plaintiff that that PIC bonds were fraudulent on May 6, 2013.   Doc. 1, ¶ 15.   PIC then informed the Navy of the fraud on May 7, 2013. *See id.*

The last clear chance doctrine likely has a very limited application to cases involving government contracts.   The doctrine is a defense to contributory negligence in which, typically, a negligent plaintiff must show elements similar to the following:

(1) that the plaintiff was in a position of danger caused by the negligence of both plaintiff and defendant; (2) that the plaintiff was oblivious to the danger, or unable to extricate herself from the position of danger; (3) that the defendant was aware, or by the exercise of

Ad-015

reasonable care should have been aware, of the plaintiff's danger and of her oblivion to it or her inability to extricate herself from it; and (4) that the defendant, with means available to him, could have avoided injuring the plaintiff after becoming aware of the danger and the plaintiff's inability to extricate herself from it, but failed to do so.

*Johnson v. Washington Metro. Area Transit Auth.*, 98 F.3d 1423, 1425 (D.C. Cir. 1996) (citations omitted) (stating the test for the last clear chance doctrine under the District of Columbia law). Even if plaintiff could establish that the doctrine should be considered in cases such as the one at bar, it certainly cannot show that it was oblivious to the danger of being left without a valid bond. In fact, based on the allegations in the complaint, plaintiff knew of the impending danger before the Navy did.

Plaintiff then raises the theoretically similar argument that the Navy knew that Eric Campbell and ISG had previously submitted fraudulent PIC bonds, and therefore had a duty to save plaintiff from itself. *See* Doc. 10 at 19. It cites the "established rule" that:

> while the [government] had no obligation to prevent (and, indeed, was free to precipitate) the avalanche that buried the contractor, it was not free, if it was aware of the impending avalanche and knew that [the contractor] was not, to stand aside and let the bidder be overwhelmed without a warning.

*J.A. Jones Const. Co. v. U. S.*, 390 F.2d 886, 888 (Ct. Cl. 1968). Assuming, however, that the Navy's superior knowledge would have imposed on it the duty to protect the plaintiff, plaintiff has failed to adequately allege facts to support this theory. In the complaint, plaintiff alleges the existence of another lawsuit against Eric Campbell and ISG for the same sort of behavior at issue here. *See* Doc. 1, ¶22. And that lawsuit does, in fact, mention the Navy. *See* Doc. 1, Exhibit O at 7-10, 18.

Plaintiff's argument in its response to the motion to dismiss, however, promises far too much. It claims that the lawsuit attached to the complaint "indicates that the NAVY was fully aware as early as November, 2012 that Eric Campbell, et al, was submitting fraudulent PIC BONDS to the NAVY." *See* Doc. 10 at 19. It does no such thing. The complaint was filed by Federal Insurance Company and Pacific Indemnity Company, and indicates no involvement or relevant knowledge on the part of the Navy. *See* Doc. 1, Exhibit O. No certificate

Ad-016

or proof of service demonstrates that a copy of the complaint was served on the Navy. In short, the mere existence of a complaint that mentions the Navy, without more, is facially insufficient to establish the required knowledge that might impose a duty on the government to protect the plaintiff.

**E.    The Navy Should Be Equitably Estopped from Terminating the Contract**

In its response to the government's motion to dismiss, plaintiff also alleges that the government should be equitably estopped from terminating the contract for default. *See* Doc. 10 at 28-30. In order to state a claim for equitable estoppel, the plaintiff must allege the following elements:

> (1) misleading conduct, which may include not only statements and actions but silence and inaction, leading another to reasonably infer that rights will not be asserted against it; (2) reliance upon this conduct; and (3) due to this reliance, material prejudice if the delayed assertion of such rights is permitted.

*Mabus v. Gen. Dynamics C4 Sys., Inc.*, 633 F.3d 1356, 1359 (Fed. Cir. 2011) (quoting *Lincoln Logs Ltd. v. Lincoln Pre-Cut Log Homes, Inc.*, 971 F.2d 732, 734 (Fed. Cir. 1992)). In addition, in order to invoke equitable estoppel against the government, plaintiff must allege affirmative misconduct. *See Rumsfeld v. United Technologies Corp.*, 315 F.3d 1361, 1377 (Fed. Cir. 2003) (citing *Zacharin v. United States,* 213 F.3d 1366, 1371 (Fed. Cir. 2000).

Here, irrespective of whether plaintiff has alleged any other elements of equitable estoppel, it has failed to allege any affirmative misconduct on the part of the Navy. Plaintiff argues that the Navy's "negligent investigation, enhanced by the imputed knowledge of the NAS Pensacola PIC bonds, is the affirmative misconduct." *See* Doc. 10 at 29. As the court has already explained at length, plaintiff has not stated a claim that the Navy has violated any duty it had to plaintiff or any regulation that was meant for plaintiff's benefit in performing its investigation. And plaintiff has entirely failed to allege facts that support its statement that the Navy had any knowledge Eric Campbell's prior, allegedly fraudulent, activity. Plaintiff's equitable estoppel theory, therefore, fails.

17

## III.  CONCLUSION

For the foregoing reasons, the government's motion to dismiss, *see* Doc. 7, is hereby **GRANTED**, and plaintiff's motion for summary judgment, *see* Doc. 8, is **DISMISSED AS MOOT**.

**SO ORDERED.**

s/ James F. Merow
James F. Merow
Senior Judge

Ad-018

# In the United States Court of Federal Claims

No. 13-695 C
(Filed May 8, 2014)

| | |
|---|---|
| ALLEN ENGINEERING | ) |
| CONTRACTOR, INC., | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| THE UNITED STATES, | ) |
| Defendant. | ) |

## ORDER

Contesting the default termination of construction contracts Allen Engineering Contractor, Inc. was performing for the United States Navy, plaintiff initiated three virtually identical complaints against the government, 1:13-CV-684, 1:13-CV-695, and 1:13-CV-720. The government filed virtually identical motions to dismiss in each of the three cases, and the court, on March 27, 2014, issued a ruling, *Allen Engineering Contractor, Inc. v. United States*, ___ Fed. Cl. ___, 2014 WL 1277907, granting the dismissal motion in the first of the three cases.

By an order, filed in this case on March 27, 2014, Doc. 20, the court directed the parties to identify any material difference between the facts alleged in the dismissed case, 1:13-CV-684, and in this case, 1:13-CV-695. Plaintiff filed a response, Doc. 22, to this order and defendant responded, Doc. 23, to plaintiff's submission.

Upon analysis of the parties' submissions, it is concluded that plaintiff has failed to identify any material difference in the 1:13-CV-695 allegations that would serve to alter the result reached in the 1:13-CV-684 dismissal ruling. Also, the March 27, 2014 Order, Doc. 20, notes that it is "[n]ot meant as a chance to amend the complaint."

Accordingly, it is **ORDERED** that for the reasons set forth in the March 27, 2014 ruling in 1:13-CV-684, cited above, the government's Motion to Dismiss, Doc. 9, is **GRANTED**, judgment shall be entered **DISMISSING** plaintiff's Complaint and plaintiff's pending Motion and Amended Motion for Summary Judgment, Docs. 8 and 19, shall be **DISMISSED AS MOOT**.

s/ James F. Merow

James F. Merow
Senior Judge

Ad-020

# In the United States Court of Federal Claims

No. 13-720 C
(Filed May 8, 2014)

| | |
|---|---|
| ALLEN ENGINEERING CONTRACTOR, INC., | ) ) |
| Plaintiff, | ) |
| v. | ) ) |
| THE UNITED STATES, | ) |
| Defendant. | ) |

## ORDER

    Contesting the default termination of construction contracts Allen Engineering Contractor, Inc. was performing for the United States Navy, plaintiff initiated three virtually identical complaints against the government, 1:13-CV-684, 1:13-CV-695, and 1:13-CV-720. The government filed virtually identical motions to dismiss in each of the three cases, and the court, on March 27, 2014, issued a ruling, *Allen Engineering Contractor, Inc. v. United States*, ___ Fed. Cl. ___, 2014 WL 1277907, granting the dismissal motion in the first of the three cases.

    By an order, filed in this case on March 27, 2014, Doc. 25, the court directed the parties to identify any material difference between the facts alleged in the dismissed case, 1:13-CV-684, and in this case, 1:13-CV-720. Plaintiff filed a response, Doc. 27, and defendant responded, Doc. 28, to plaintiff's submission.

    Upon analysis of the parties' submissions, it is concluded that plaintiff has failed to identify any material difference in the 1:13-CV-720 allegations that would serve to alter the result reached in the 1:13-CV-684 dismissal ruling. Also, the March 27, 2014 Order, Doc. 25, notes that it is "[n]ot meant as a chance to amend the complaint."

    Accordingly, it is **ORDERED** that for the reasons set forth in the March 27, 2014 ruling in 1:13-CV-684, cited above, the government's Motion to Dismiss, Doc. 14, is **GRANTED**, judgment shall be entered **DISMISSING** plaintiff's Complaint and plaintiff's pending Motion and Amended Motion for Summary Judgment, Docs. 15 and 24, shall be **DISMISSED AS MOOT**.

s/ James F. Merow

James F. Merow
Senior Judge

Ad-022

Form 19

FORM 19. Certificate of Compliance With Rule 32(a)

---

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.    This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) or Federal Rule of Appellate Procedure 28.1(e).

☑    The brief contains [        10, 861        ] words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), or

☐    The brief uses a monospaced typeface and contains [                    ] lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or Federal Rule of Appellate Procedure 28.1(e) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

☑    The brief has been prepared in a proportionally spaced typeface using
[            MICROSOFT WORD 2013            ] in
[            Times New Roman Size 14            ], or

☐    The brief has been prepared in a monospaced typeface using
[                                    ] with [
[                                    ].

_____
(Signature of Attorney)

William L. Bruckner
_____
(Name of Attorney)

APPELLANT
_____
(State whether representing appellant, appellee, etc.)

August 11, 2014
_____
(Date)

Reset Fields

## CERTIFICATE OF SERVICE

I hereby certify that on August 11, 2014, a copy of the foregoing "Brief of

Plaintiff-Appellant Allen Engineering Contractor, Inc." was sent to the following

attorneys by e-mail; and that a copy of the foregoing brief was filed with the court

using the court's CM/ECF system, which will send notification of that filing to the

following attorneys who have registered for electronic service:

Eric Laufgraben
Email: eric.e.laufgraben@usdoj.gov
Department of Justice
Commercial Litigation Branch, Civil Division
PO Box 480
Ben Franklin Station
Washington, DC 20044

Chelsey N. Del Testa